**UNITED STATES of America,**
**Appellee,**

v.

**John TORTORA, Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**Samuel SANTORO, Appellant.**

**Nos. 496, 642, Dockets 71–2114, 72–1170.**

United States Court of Appeals,
Second Circuit.

Argued April 4, 1972.

Decided July 24, 1972.

Stephen J. Sundvold, Atty. (Henry E. Petersen, Asst. Atty. Gen. and Sidney M. Glazer, Atty., Dept. of Justice, Washington, D.C., on the brief), for appellee.

Irving Anolik, New York City, for appellant Tortora.

Irving Anolik, New York City, of counsel to Lanna, Coppola & Rosato, Yonkers, for appellant Santoro.

Before CLARK, Associate Justice,* LUMBARD and KAUFMAN, Circuit Judges.

LUMBARD, Circuit Judge:

Samuel Santoro and John Tortora were found guilty after a jury trial in the Southern District on fifteen counts of engaging in loanshark operations in violation of the federal Extortionate Credit Statute, 18 U.S.C. §§ 892–94, and on one count of conspiring so to do.[1] We affirm.

Appellants seek reversal of their convictions on several grounds, principal among them being Santoro's claim that his trial could not proceed in his absence.

The indictment charged that Santoro and Tortora, along with Joseph Chiave-

---

* United States Supreme Court, retired, sitting by designation.

[1]. Tortora was sentenced to 10 years imprisonment on each of the substantive counts and five years on the conspiracy count, the sentences to run concurrently.

Santoro was sentenced to seven years on each of the substantive counts and five years on the conspiracy count, the sentences also concurrent. In addition, he received a five year sentence for jumping bail, to run concurrently with his other sentences.

rini, Gene Genaro and Nicholas Ratteni, lent money to Joseph Formiglia although they had reasonable grounds to believe that the money would be used by Formiglia to make extortionate loans. It further charged that they had used extortionate means to collect the money loaned to Formiglia.

The scheme began in November 1969 when Formiglia, a jeweler, borrowed $400 from Santoro, promising to pay $40 a week interest until the $400 principal was repaid. Shortly after this first loan was made Formiglia wanted additional money, but did not want to borrow it under his own name. Thus he conceived the idea of borrowing from Santoro on the pretext that he himself was relending the money at usurious rates. Beginning in early December 1969, Santoro made additional loans to Formiglia, amounting to approximately $11,000 by the middle of February 1970. Tortora frequently was present when these loans were made. Ratteni was present at two of the transactions.

By late February 1970, Santoro suspected that Formiglia was not actually relending the money. Chiaverini was delegated to go with Formiglia on his next collection date to visit his "customers." When Formiglia protested that his customers might not like this arrangement, Santoro said, "We'll go around and collect the f____' money or we'll break their heads if they don't pay us."

Formiglia feigned sickness on the collection date, but this merely confirmed Santoro's suspicions that Formiglia's customers were nonexistent and that the "loans" were only a pretense to cover Formiglia's own borrowing. Santoro met with Formiglia and threatened to split Formiglia's tongue or put a "bullet through [his] head" unless the money was repaid.

A few days later Tortora went to the jewelry store where Formiglia worked and told him, "My man, you are in a lot of trouble . . . what are you going to do about these f_____ loans." No arrangements for repayment were made, however. Later that day Santoro telephoned Formiglia, who said that he was going out of town, whereupon Santoro replied, "Have a good time because it's your last trip." The next week Tortora went to Formiglia's store and told him to show up at a meeting at Genaro's fish market regarding repayment of the loans or Tortora would "drag [him] up by [his] head."

Frightened by these threats, Formiglia called the Yonkers Sheriff's office and was instructed to telephone Tortora and delay the meeting one day. The Sheriff's office then recorded the conversation.

Wearing a hidden tape recorder supplied by the Sheriff's office, Formiglia met with Tortora the following day at the fish market. Tortora accused Formiglia of juggling the loans and suggested that to repay the loans Formiglia might have to rob a store. Tortora then telephoned Santoro and put Formiglia on the line. Santoro said that if Formiglia did not pay he would break Formiglia's wife's head and burn down his house. Tortora then told Formiglia that he better work out a deal to repay the money.

The next day Formiglia arranged to go to Santoro's house, ostensibly to repay the loans. He brought with him money supplied by the Westchester County District Attorney's Office. After Formiglia had been in the house a short while, investigators from the District Attorney's Office entered and arrested Santoro with his hands on the money. Tortora was later arrested by the FBI.

Both Santoro and Tortora pleaded not guilty to the indictments in January 1971 and were released on bail. The case was called for trial on April 15, 1971. At that time Judge Pollack was advised that the attorney for the government had trial commitments in May, and that the attorney for Ratteni also had trials during May and another set for June 21. Additionally, a government agent assigned to the case was unavailable between July 17 and July 24.

Santoro was then in court with Peter Rosato, a partner of Santoro's retained counsel, Vincent W. Lanna. Rosato told the court that Lanna was then on trial in a state criminal case which would take until the middle of May, had other trial and Army reserve military obligations through the end of August, and would be free only from July 12 to July 26. Judge Pollack thereupon set August 10 as the most convenient date for trial and told Santoro to arrange for substitute counsel if Lanna would be unable to appear.

Lanna wrote to the court on July 21 that Santoro had refused other counsel and insisted that Lanna represent him. The trial judge notified Lanna that the trial would proceed as scheduled and that he was not relieved of his duties as counsel.

The case was called for trial on August 10 with 100 veniremen present. The Government, Genaro and Ratteni were ready. Tortora and Chiaverini were absent, having been hospitalized allegedly for bronchitis and back pains respectively. The court revoked bail and issued bench warrants for their arrest. Santoro was present with Rosato, but Lanna was absent on military duty. The court then assigned Rosato to represent Santoro, but said that an additional attorney would be appointed if Santoro or Rosato desired. Santoro later accepted the court's offer and Mark Landsman was assigned as an additional defense attorney. The court then reset the trial date for August 16.

On August 16 Tortora was brought to court. Dr. George Grayson, chief resident of the Chest Center at Bellevue Hospital, testified that Tortora was able to participate in his defense. After hearing this testimony and observing Tortora, the court ruled that he was competent to stand trial.

The remainder of the defendants, except for Santoro, were also present.[2] Rosato and Landsman told the court that they had both last seen Santoro on August 12. Rosato, however, had been telephoned by Santoro on August 15 to arrange for Rosato to drive him to court the next morning. Santoro was not at his apartment on August 16 when Rosato arrived although Santoro's wife indicated that he had been there the day before.

The court found that the trial of the case had commenced on August 10 and that, as Santoro had voluntarily and knowingly absented himself from the trial, there was no reason not to continue the trial with him as a defendant. Santoro was thus tried along with Tortora, Chiaverini, Genaro, and Ratteni.[3]

The Government's case consisted mainly of Formiglia's testimony and the taped conversations among Formiglia, Tortora and Santoro.

On Thursday, August 19, while the Government was still presenting its case, the court told the attorneys for the defendants that, if at all possible, testimony was to be concluded that week even if it meant a Saturday court day and that the defendants should have their witnesses present and ready to testify. On Friday the Government rested and Ratteni and Chiaverini each presented three witnesses and concluded their cases. Tortora's counsel told the court that he was unable to proceed at that time because Genaro's counsel had mistakenly sent one of Tortora's five witnesses home and the others weren't present. No showing was made as to what the absent witnesses would have testified. The court refused to grant a continuance, stating that the attorneys had been instructed to have all their witnesses present to testify in order that the trial be completed as quickly as possible.

2. On August 13, Chiaverini was produced in court. The court heard extensive medical testimony regarding his medical condition. After the hearing, the court ruled that Chiaverini was competent to stand trial.

3. Santoro was later apprehended and pled guilty, on January 25, 1972, to a charge of bail jumping. See note 1, supra.

When Santoro offered no defense, court was adjourned until Monday. On Monday no further offer of proof was made on behalf of Tortora and none of his witnesses was present to testify.

At the close of the Government's case the court had dismissed the indictment against Genaro for insufficient evidence. The case against the remaining defendants was sent to the jury under proper instructions. The jury acquitted Chiaverini and Ratteni, but convicted Santoro and Tortora.

■ Tortora claims that he was improperly denied the right to present witnesses on his behalf by the court's refusal to grant a continuance on Friday afternoon. He had been advised by the court, however, to have his witnesses present and ready to testify. Apart from the witness mistakenly excused, Tortora should have had his other witnesses ready so that the trial would have been able to go forward. The witnesses were not even produced on Monday when the trial continued. Moreover, Tortora made no attempt to show that a continuance was warranted. The trial had been delayed numerous times and the trial judge may well have thought he was faced with another ploy to delay it further. Tortora should have made an offer as to what the witnesses would have testified to enable the trial judge to determine whether there was good cause for a continuance. United States v. Costa, 425 F.2d 950, 953 (2d Cir. 1969), cert. denied, 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 272 (1970). "[I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence . . . [Whether] a denial of a continuance is so arbitrary as to violate due process . . . must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849,

11 L.Ed.2d 921 (1964). Under the circumstances of this case, the trial judge did not abuse his discretion in failing to grant a continuance. United States v. Harris, 441 F.2d 1333, 1336 (10th Cir. 1971).

Tortora also claims that two of the prosecutor's statements in his summation were so prejudicial and inflammatory as to preclude a fair trial. During his summation the Assistant United States Attorney said,

" . . . And I submit that Formiglia was expected to get this money one way or the other to pay back these rates of interest. It was expected that Formiglia's existence was the security and that if Formiglia was to get the money any way he could, whether it be to rob a store, whether it be to push narcotics, he was expected to repay the money and I say to you it is an ironic fate of justice, it is an ironic justice that instead of robbing a bank, instead of robbing a store, instead of pushing narcotics, Joseph Formiglia cheated them . . . ."

At another point he remarked "[H]ow much strength does it take to pull a trigger?"

■ The rhetorical question was in response to the defense suggestion that Tortora was too small to frighten Formiglia and extort money from him. As a response to prior argument, the statement was within the limits of fair argument. United States v. Mattio, 388 F.2d 368, 371 (2d Cir.), cert. denied, 390 U.S. 1043, 88 S.Ct. 1643, 20 L.Ed.2d 305 (1968). Inasmuch as there was no evidence that the defendants had asked Formiglia to sell narcotics, however, the prosecutor's statement indicating to the contrary was improper. But it was only a passing reference, and we are convinced that it did not improperly affect the jury's verdict. Defendants are entitled only to a fair trial, not a perfect one.[4]

4. We deal with Tortora's other contentions seriatim. The trial judge's determination that Tortora was competent to stand trial was arrived at only after hearing testimony and personally observing Tortora and was supported by substantial evidence. United States v. Bernstein, 417 F.2d 641, 643 (2d Cir. 1969). The tape recordings

We come now to Santoro's contention that the trial of the charges against him should have been adjourned when he failed to appear in court on August 16. Briefly, he argues that no trial can begin unless the defendant is present, Rule 43, F.R.Crim.P., that the trial did not begin until August 16, at which time he was absent from the courtroom, and that his conviction was therefore unconstitutional. We disagree, and hold that a defendant may waive his right to insist that his trial begin only in his presence. When a defendant has pleaded to the charges against him and knows that the trial of the charges is to begin on a day certain, the trial may start in his absence if he deliberately absents himself without some sound reason for remaining away. Under the circumstances of this case, Santoro's failure to attend court on August 16, when he knew that a jury would be selected and evidence presented, was a knowing and voluntary waiver of his right to be present at trial.

Like any constitutional guarantee, the defendant's right to be present at trial may be waived, Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934), even if that waiver is implied from the defendant's conduct, Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The Supreme Court had long held that a defendant who knowingly absents himself from the courtroom during trial "leaves the court free to proceed with trial in like manner and with like effect as if he were present." Diaz v. United States, 223 U.S. 442, 445, 32 S.Ct. 250, 254, 56 L.Ed. 500 (1912). Although to date, with the exception of the courts of one state, see State v. Tacon, 107 Ariz. 353, 488 P.2d 973

(1971), cert. granted, 407 U.S. 909, 92 S.Ct. 2446, 32 L.Ed.2d 682 (June 12, 1972), waiver has been found only if the defendant was present at least as late in the proceedings as the empanelment of the jury, we see no reason for a different result when the defendant absents himself, under the specific circumstances outlined herein, before the jury has been selected.

Waiver of a constitutional right must be both "knowing" and "voluntary." A defendant who deliberately fails to appear in court does so voluntarily, and thus the important question is whether his absence can be considered a "knowing" waiver. We hold that it can. The deliberate absence of a defendant who knows that he stands accused in a criminal case and that the trial will begin on a day certain indicates nothing less than an intention to obstruct the orderly processes of justice. No defendant has a unilateral right to set the time or circumstances under which he will be tried. See United States v. Bentvena, 319 F.2d 916 (2d Cir.) cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). When a trial judge designates a date for trial the defendant's obligation is to appear ready in court on that date. "[T]he right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." Stack v. Boyle, 342 U.S. 1, 4, 72 S.Ct. 1, 4, 96 L.Ed. 3 (1951).

Without this obligation on the accused the disposition of criminal cases would be subject to the whims of defendants who could frustrate the speedy satisfaction of justice by absenting themselves from their trials. Today more than ever the public interest

---

were admissible according to the trial judge's discretion and nothing indicates that he abused that discretion. United States v. Kaufer, 387 F.2d 17, 19 (2d Cir. 1967). The statutes are not bills of pains and penalties directed against a class and prescribing guilt without a trial, but define with particularity certain criminal acts whose commission by the defendants must

be proved at trial. Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867). The trial judge was entitled to receive hearsay evidence in determining Tortora's sentence. United States v. Schipani, 435 F.2d 26, 27 (2d Cir. 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971).

demands that criminal proceedings be prosecuted with dispatch, see Second Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, 28 U.S. C.A. 442 (1972 Supp.), and the greater the delay between the charge and the trial date, the greater the likelihood that witnesses will be unable to appear or that their memories will have faded and their testimony will be less convincing. That a defendant can be convicted of bail-jumping if he fails to appear at trial is not sufficient to vindicate the public interest; the public is entitled to a speedy disposition of the criminal charges absent a finding by the court that good reasons exist for delay. "Thus there can be no doubt whatever that the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward." Illinois v. Allen, *supra*, 397 U.S. at 349, 90 S.Ct. at 1063 (Brennan, J., concurring). A defendant's knowing and deliberate absence does not deprive the court of the power to begin the trial and to continue it until a verdict is reached.

 Before a trial may proceed in the defendant's absence, the judge must find that the defendant has had adequate notice of the charges and proceedings against him. Notice is initially given to a defendant by the issuance of an indictment. But not until the defendant answers the indictment by pleading in open court to the charges therein can a court know with certainty that the defendant has been apprised of the proceedings begun against him. Thus no defendant can be tried until after he personally has entered a plea to the charge. It must clearly appear in the record, how-ever, that the defendant was advised when proceedings were to commence and that he voluntarily, knowingly, and without justification failed to be present at the designated time and place before the trial may proceed in his absence. Cureton v. United States, 130 U.S.App. D.C. 22, 396 F.2d 671, 676 (1968); State v. Tacon, *supra*. This assures that the defendant has been accorded an opportunity to be present at all critical stages of the trial, see Rule 43 F.R.Crim. P., and thereby affords him due process of law. Having received actual notice when trial proceedings will take place, in the absence of some compelling excuse the defendant cannot obstruct the course of justice by absenting himself from the process, cf. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).[5]

 On the facts of this case, there were no constitutional constraints against the trial judge's proceeding with the trial even though Santoro failed to appear on August 16. Santoro had pleaded not guilty to the indictment on January 8, 1971. Released on $20,000 bail, he then appeared before Judge Pollack on April 15, 1971, when the case was called for trial, and also on August 10, 1971, the date the court had set as the most convenient for this multiple-defendant trial. Santoro was present in open court when Judge Pollack continued the case until August 16. Indeed, at 11:30 P.M. on the evening of August 15, Santoro called his attorney to arrange for a ride to court the following morning. Thus it is clear beyond peradventure that Santoro had been adequately apprised that he was to appear in court on August 16 and that his trial would commence on that day. No justification, either to the district

---

5. As we think the controlling question is one of waiver, we find irrelevant those cases which deal with when jeopardy attaches. Thus Santoro's citation of the double jeopardy cases holding that no jeopardy attaches until the jury has been empaneled is of no moment. The rule that jeopardy attaches once the jury is empaneled represents an historical judgment that, after the jury's empaneling, the pressures inherent in a criminal proceeding reach such proportions that a defendant, absent exceptional circumstances, should not be made to run the gantlet more than once. Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed. 2d 199 (1957). But guaranteeing a defendant this right does not answer the very different question of whether and when he has waived his right that the trial take place in his presence.

court or on appeal, has been offered for his absence. Having had every opportunity to present his defense, Santoro cannot now complain of his failure actively to participate therein or of the trial having proceeded without him. Accordingly, we hold that his conviction complied with all the requisites of the Constitution.[6]

 It is obviously desirable that a defendant be present at his own trial. We do not here lay down a general rule that, in every case in which the defendant is voluntarily absent at the empanelment of the jury and the taking of evidence, the trial judge should proceed with the trial. We only hold that this is within the discretion of the trial judge, to be utilized only in circumstances as extraordinary as those before us. Indeed, we would add that this discretion should be exercised only when the public interest clearly outweighs that of the voluntarily absent defendant. Whether the trial will proceed will depend upon the trial judge's determination of a complex of issues. He must weigh the likelihood that the trial could soon take place with the defendant present; the difficulty of rescheduling, particularly in multiple-defendant trials; the burden on the Government in having to undertake two trials, again particularly in multiple-defendant trials where the evidence against the defendants is often overlapping and more than one trial might keep the Government's witnesses in substantial jeopardy.[7]

 We hold that the trial judge was well within his discretion in refusing to adjourn the trial on August 16 or to sever Santoro's trial from that of the other defendants. As a result of the difficulty of coordinating the defense attorneys' conflicting schedules and the unsubstantiated claims of physical ailments made by two other defendants, numerous delays had already occurred in this multiple-defendant trial. The Government's case rested almost exclusively on the testimony of one witness who had already been threatened on numerous occasions by the appellants. Extensive delays would almost certainly have accompanied any adjournment and the Government's main witness would have continued to be in potential danger until his testimony was completed. Severance would have added substantially to the burden on the Government and its witnesses, necessitating two trials in the place of one: it would have been an unwarranted delay in the expeditious administration of justice. Moreover, the danger to the Government's witness would have continued until that indefinite time in the future when the witness's testimony in the second trial would have been completed.

 Santoro's only other claim of substance is that he was deprived of his Sixth Amendment right to the counsel of his choice. We cannot agree. No defendant has an absolute right to any particular counsel. Indeed the right to counsel can be waived entirely if a defendant does not retain an attorney within a reasonable time as set by the trial court. United States v. DiStefano, 464 F.2d 845 (2d Cir. July 18, 1972) at n. 1; United States v. Arlen, 252 F.2d 491 (2d Cir. 1958). Santoro was informed of the trial date more than three months in advance and was advised by the court that other counsel should be secured if Lanna were unable to appear. In fact, Santoro was represented by Mr. Rosato, who was familiar with the case, and by Mark Landsman, a Legal Aid attorney. Thus no prejudice resulted to him from the unavailability of Lanna.

Affirmed.

---

6. Similarly, Santoro's conviction complies with the requisites of Rule 43 of the Federal Rules of Criminal Procedure. The rule is no more than a restatement of the defendant's constitutional rights, see Advisory Committee Note ("the rule is a restatement of existing laws"), and its protections can be waived by the defendant's conduct.

7. It is difficult for us to conceive of any case where the exercise of this discretion would be appropriate other than a multiple-defendant case.