UNITED STATES of America,
Plaintiff–Appellee,

v.

Harry R. WATKINS, Defendant–
Appellant.

No. 91–2576.

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1992.

Decided Jan. 19, 1993.

James A. Shapiro, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Crim. Div. and Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Standish E. Willis and Judith A. Scully (argued), Chicago, IL, for defendant-appellant.

Before CUDAHY, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

On April 23, 1991, Harry Watkins' trial on three counts related to threatening telephone calls to equal employment opportunity personnel of the Internal Revenue Service (IRS) was set to begin. Prior to jury selection, the district court excluded Mr. Watkins from the courtroom. The court found that he had knowingly and voluntarily waived his right to be present during trial. The trial proceeded in his absence, and Mr. Watkins was convicted. He now appeals, and we reverse the judgment of the district court and remand for new trial.

I

BACKGROUND

After dismissal from his position as a taxpayer service representative for the IRS in Chicago, Mr. Watkins filed a complaint with the equal employment office of the IRS, which found that his discharge had not been racially motivated. Dissatisfied with this determination, Mr. Watkins began to telephone the IRS Complaint Center and requested that his concerns be addressed by a black equal employment opportunity specialist, a black hearing examiner, and a black court reporter. His calls were accompanied by vile language, and he was subsequently charged with three counts of making threatening telephone calls to IRS employees. See 18 U.S.C. § 115(a)(1)(B).

On March 4, 1991, on the defendant's motion, the district court ordered a psychiatric evaluation to assess Mr. Watkins' competency to stand trial. When defense counsel advised the court that it would assert that Mr. Watkins did not have the requisite mens rea to commit the offense charged, the prosecution requested another psychiatric examination to determine Mr. Watkins' mental state at the time of the alleged offenses. On April 15, defense counsel informed the government that, while the defense would not present an insanity defense, it would call the psychologist as an expert witness to support the argument that Mr. Watkins lacked the requisite mens rea. The government's motion in limine to exclude such evidence was denied at an evidentiary hearing at which Mr. Watkins was present. During the course of that hearing, the examining psychologist, Dr. Daniel Foster, testified that Mr. Watkins was competent to stand trial and that he suffered from a paranoid personality disorder. Specifically, Dr. Foster re-

marked, when asked if Mr. Watkins was psychotic, that "[w]ith a paranoid personality disorder you can have psychotic episodes, but they won't be of sufficient duration that you would necessarily even treat him with an antipsychotic medication." Hearing at 14. Dr. Foster explained that this condition is characterized by "a reflexive response when they feel threatened to try to run people off, to get people away from them, to try to control the situation." *Id.* at 18. He also testified that "[a]nger is an ongoing reflection of his condition." *Id.* at 23. In addition, Dr. Foster's testimony indicated that, at the time of the charged incidents, Mr. Watkins had "at least a marginal degree of self-control over criminal behavior ... [and that his behavior] implies at least a marginal degree of volitional control and awareness of the potential illegality of his act." *Id.* at 35.

Mr. Watkins was incarcerated at the Metropolitan Correctional Center (MCC) prior to trial. On the day jury selection was to begin, April 23, 1991, he refused to dress for court or willingly to leave his cell. He was removed forcibly from the cell and transferred to the courthouse. Prior to Mr. Watkins' arrival in court, the district court, which had been apprised informally of Mr. Watkins' behavior at the MCC, stated to Mr. Watkins' counsel:

> First he said he wouldn't come to court, then he said he would come to court only if he were carried, and I view this conduct as inexcusable, Mr. Willis.
>
> .     .     .     .     .
>
> I want you to convey that to your client. I think he is willfully, willfully trying to obstruct this trial. I think that he is putting a terrible burden on the Marshal's Office, and he is aware of it.... [I]t is clear that [Mr. Watkins] very well knows what is going on here and how he can obstruct these proceedings.

Tr. at 2–3. The court then raised the possibility of waiver:

> I am now looking into what constitutes waiver to be present at trial. If you

have any cases either of you would like to bring to my attention as to at what point Mr. Watkins waives his right to be present in his trial—maybe he would just as soon waive that right himself, I don't know—but by his conduct it certainly appears that he is working toward that aim.

Tr. at 3.

In the exchange that followed, both counsel for the government and counsel for the defendant informed the court that they had been apprised of certain events in the MCC that had resulted in the defendant's being placed on suicide watch by the officials of the MCC. Government counsel informed the court that, because the defendant had attempted to hang himself with a shirt, he had been manacled to the lower bar of his cell. Defense counsel reported that the defendant had related two "suicidal episodes." Tr. at 4. Defense counsel also told the court that Mr. Watkins had refused to eat for three days despite counsel's admonition that he would need his strength in order to assist in his defense. The court then said to Mr. Watkins' counsel: "I would suggest that you consult with him when he arrives and determine whether or not he wishes to waive his presence at trial. He is certainly welcome to remain at the MCC during this trial, if that's his desire." Tr. at 5. The court terminated the proceedings by noting that "the jury has been waiting since 9:00 o'clock. That is inexcusable." Tr. at 5.[1]

Immediately after these remarks, court was adjourned (9:50 a.m.) and then reconvened at 10:12 a.m. with Mr. Watkins present. The colloquy then proceeded as follows:

> THE COURT: All right, the record should reflect that the defendant is present in court but not cooperating with the Court, nor did he stand when asked to rise by the clerk.
>
> MR. WILLIS: He is not, he is not communicating at this point, the record should also reflect that.

At no point did the potential jurors see Mr. Watkins in the courtroom.

---

1. While a venire had been assembled at 9:00 a.m., it had not yet been invited into the courtroom. No jury had been selected for this case.

THE COURT: Yes.

MR. WILLIS: I don't know if he knows what's going on.

THE COURT: Well, I certainly think, based on the testimony of the psychologist yesterday and his own self-serving conduct, he knows well what's going on, Mr. Willis, and this is an intentional effort to obstruct this trial.

I find that the defendant's lack of cooperation with the U.S. Marshal, and his statement to the U.S. Marshal that he will not walk into the courtroom, he will not rise when the, when the judge enters the courtroom, he will not cooperate with counsel, is designed to obstruct this trial; I think it's manipulative. And under [*United States v. Houtchens*, 926 F.2d 824 (9th Cir.1991)] that the defendant by his conduct has knowingly and voluntarily waived his presence at trial, his right to be present at trial. Also [*United States v. Fontanez*, 878 F.2d 33 (2d Cir. 1989)]; again, where a defendant deliberately absented himself from trial.

I think that case stands for the principle that a defendant who by his conduct tries to prevent a trial from going forward in fact waives his, knowingly and voluntarily waives his right to be present at trial. And I regret the circumstance; if he is refusing to cooperate with you it's not because he is mentally incapable of cooperating with you, Mr. Willis, and I appreciate the extraordinary efforts you have made in attempting to represent Mr. Watkins' best interests, but I find that his conduct is willful.

Tr. at 6–7.[2]

Mr. Watkins' counsel then objected to proceeding with the trial in view of Mr. Watkins' psychiatric history, but the district court opined that declining to proceed would constitute "playing his game," Tr. at 7, overruled the objection, and had Mr. Watkins removed from the courtroom. Defense counsel also requested a delay until Mr. Watkins could be examined, but the court denied the request. Tr. at 9.

The transcript reflects that court was recessed at 10:15 a.m. The entire proceeding in the presence of the defendant lasted three minutes. Despite the information it had just received from both counsel, the district court concluded, without further inquiry, that the defendant understood the implications of his actions and was capable of consulting with counsel. Nevertheless, at no time during this period did the court attempt to ascertain whether defense counsel had followed through on the court's direction that counsel determine whether the defendant wished to waive his right to be present at the proceedings. Nor did the district court, at any time during those three minutes, ever attempt to ascertain directly from the defendant whether he understood his right to be present or the implications of his conduct.

When court resumed at 10:21 a.m., in Mr. Watkins' absence, the court declared that "it is clearly in the public interest to proceed with the trial in a case where a defendant attempts unilaterally to obstruct proceedings, and that public interest clearly outweighs that of the voluntarily absent defendant, under *Fontanez*." Tr. at 9. The district court also informed counsel that it planned to have the marshall who had dealt with the defendant that morning at the MCC appear in court and describe the morning's events. The district court noted that, at this point, its ruling was based upon "sort of third degree hearsay." Tr. at 10. The district court then proceeded with the selection of the jury and gave the selected panel its introductory instructions. At 12:21 p.m., the trial was recessed for lunch. The district court noted that it had several other judicial matters scheduled before the resumption of trial at 2:00 p.m. and also indicated that it planned to

---

**2.** Government counsel took care to put a description of Mr. Watkins' in-court demeanor on the record:

> Your Honor, may I just point out for the record, as a factual matter, that in relation to your finding, that as we sit here in the courtroom Mr. Watkins is in a wheelchair with his head down on what appears to be a pillowlike object on the table, and in an apparent, and I say "apparent"—emphasize "apparent" unconscious attitude, and that that would be in the view of the jury if Mr. Watkins was present during the trial.
>
> Tr. at 7.

have the officers from the MCC on hand at about 1:50 p.m. to testify on the record as to the morning's events.

At 2:10 p.m., the district court resumed proceedings out of the presence of the jury. Present in court were Lieutenant Simek, the officer in charge of the day watch operations at the MCC, and Dr. Pindelski, chief psychologist at the MCC. Noting its concern about keeping the jury waiting, the court inquired if it would be an inconvenience on the prison if the officers were to return at 4:00 p.m. Although the Doctor did indicate that such an arrangement would be inconvenient, the court opted for such a schedule: "I just hate to keep the jury waiting." Tr. at 20. That afternoon, the court, sitting with a jury, took evidence in the defendant's case. He was not present.

At 4:07 p.m., the court held a hearing at which it heard the testimony of Lieutenant Simek and Dr. Pindelski. They testified under oath and described Mr. Watkins' conduct at the MCC that morning. They testified that Mr. Watkins knew that he was to go to court and was verbally responsive.[3] Dr. Pindelski related that, at one point, the defendant told him: "It's principles, I refuse to go to court." Tr. at 89. Dr. Pindelski described Mr. Watkins as very agitated and angry. The Doctor also testified that the defendant recognized the Doctor and "knew his circumstances. He was well-oriented in that regard." Tr. at 90. When Mr. Watkins would not come to the door to be handcuffed, the MCC personnel were obliged to enter Mr. Watkins' cell and forcibly remove him. At that point, he went limp. He was then carried out and he appeared in court in a wheelchair.

At the end of the testimony, the district court made no findings with respect to the testimony of the MCC officials. Instead, the court turned, without any comment, to the matter of instructions. Tr. at 91. At the end of the session, the court asked whether defense counsel would visit his client that evening:

THE COURT: All right, do you intend to visit with the defendant this evening?
MR. WILLIS: I'm going to try to, yes.
THE COURT: All right, well, if he changes his mind about cooperating with the Marshal's Office and appearing tomorrow, he is certainly welcome to come back.

Tr. at 93.

After the resumption of trial the next morning, during a conference on instructions, the following exchange took place:

THE COURT: —All right, Mr. Willis, did you have a chance to tell your client that he certainly has the option of returning?
MR. WILLIS: No, I didn't, Judge. I talked to the doctor, and he said he was going to try to visit with him today, and I asked him to convey that to him.
THE COURT: Yes. That he certainly has the option of returning to court; it's his decision.
MR. WILLIS: Sure.

Tr. at 96.

The trial proceeded without Mr. Watkins' presence. He was convicted on all three counts and was subsequently sentenced to ten months' incarceration to be followed by two years of supervised release and psychiatric counselling.

## II

## ANALYSIS

### A.

This case requires that we reconcile two important and competing concerns in our criminal justice system—the right of the person accused of a criminal offense to be present at the proceeding and the need of our courts to undertake the process of adjudication fairly, dispassionately, and with a reasonable degree of dispatch.

The basic principles governing the right of an accused person to be present at trial are well-settled. A defendant in a criminal case has a right to be present at

---

**3.** The district court posed most of the questions during this hearing. Counsel for the defendant had several questions for the Lieutenant. Neither counsel posed any to the psychologist.

trial under both the Sixth Amendment[4] and Federal Rule of Criminal Procedure 43.[5] *See Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). In addition, under the Due Process Clauses of the Fifth and Fourteenth Amendments, a defendant must be present "to the extent that a fair and just hearing would be thwarted by his absence." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)).[6] Under certain circumstances, a defendant may waive this right to be present. *See Diaz v. United States*, 223 U.S. 442, 456–58, 32 S.Ct. 250, 254–55, 56 L.Ed. 500 (1912) (the result in this case was codified in Federal Rule of Criminal Procedure 43(b)); *see also Crosby v. United States*, —— U.S. ——, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993) (holding that Rule 43 prohibits the trial in absentia of a defendant who is not present at the beginning of trial); *Taylor v. United States*, 414 U.S. 17, 20, 94 S.Ct. 194, 196, 38 L.Ed.2d 174 (1973) (confirming the constitutionality of Rule 43); *United States v. Hernandez*, 873 F.2d 516, 518 (2d Cir.1989). However, the waiver must be both knowing and voluntary. *Taylor*, 414 U.S. at 18–20, 94 S.Ct. at 194–96; *Diaz*, 223 U.S. at 455–58, 32 S.Ct. at 254–55. In addition, the court "must indulge every reasonable pre-

sumption against the loss of constitutional rights." *Allen*, 397 U.S. at 343, 90 S.Ct. at 1060 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

The countervailing concerns are also well-established and have been most comprehensively and eloquently stated by Justice Black in *Allen*, 397 U.S. at 346, 90 S.Ct. at 1062:

> But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes. As guardians of the public welfare, our state and federal judicial systems strive to administer equal justice to the rich and the poor, the good and the bad, the native and foreign born of every race, nationality, and religion.

■■■ In reconciling these competing interests, we start on what is common ground for the parties. When an appellate court is asked to review a district court's determination that the defendant has

---

**4.** U.S. Const. amend. VI provides in pertinent part:

> In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

**5.** Federal Rule of Criminal Procedure 43 provides:

> (a) **Presence Required.** The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.
>
> (b) **Continued Presence Not Required.** The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present
>
> (1) is voluntarily absent after the trial has commenced (whether or not the defendant

has been informed by the court of the obligation to remain during the trial), or

> (2) after being warned by the court that disruptive conduct will cause the removal of the defendant from the courtroom, persists in conduct which is such as to justify exclusion from the courtroom.

"Rule 43 has traditionally been understood to codify both a defendant's constitutional right and his common law right to presence. Accordingly, its 'protective scope' is broader than the constitutional right alone." *United States v. Camacho*, 955 F.2d 950, 953 (4th Cir.1992) (quoting *United States v. Alessandrello*, 637 F.2d 131, 138 (3d Cir.1980), *cert. denied*, 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981)).

**6.** *See also United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (A defendant in a criminal case has "a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'") (quoting *Snyder*, 291 U.S. at 105–106, 54 S.Ct. at 332).

waived his right to be present at trial, we conduct a three-part inquiry. First, we determine whether the district court abused its discretion when it found that the accused had knowingly and voluntarily waived the right. *Fontanez,* 878 F.2d at 35. The district court's factual finding that the waiver is knowing and voluntary is reviewable for clear error. *Houtchens,* 926 F.2d at 827. Among the grounds for reversal at this stage is a determination that the district court has "left unexplored serious questions as to whether the appellant's absence was knowing and voluntary." *See Hernandez,* 873 F.2d at 519.

■ Next, if we determine that the court found proper waiver, we must consider whether the court appropriately exercised its discretion in concluding that there was a "controlling public interest to continue the trial in the defendant's absence." *Fontanez,* 878 F.2d at 35. The prevailing analysis was set forth by the Second Circuit in *United States v. Tortora,* 464 F.2d 1202 (2d Cir.), *cert. denied sub nom. Santoro v. United States,* 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972). The court must consider the following factors:

> the likelihood that the trial can take place with the defendant present, the difficulty of rescheduling, and the burden on the government and inconvenience to jurors of having to undertake two trials, particularly in a multiple defendant case.

*Fontanez,* 878 F.2d 33, 37 (2d Cir.1989) (citing *Tortora,* 464 F.2d at 1210). *Accord United States v. Sanchez,* 790 F.2d 245, 250 (2d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 587 (1986). Like the Fifth Circuit, we would also add to these factors the inconvenience to jurors. *United States v. Beltran–Nunez,* 716 F.2d 287, 290 (5th Cir.1983); *United States v. Benavides,* 596 F.2d 137, 140 (5th Cir.1979). Application of this analysis ought not to be governed by "the technicalities of a test-tube procedural rule." *Beltran–Nunez,* 716 F.2d at 291 (Jolly, J., dissenting). However, the district court's inquiry must reflect

a concern for the mandate of the Supreme Court that "courts must indulge in every reasonable presumption against the loss of constitutional rights." *Allen,* 397 U.S. at 343, 90 S.Ct. at 1060 (citing *Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023).

Finally, if we conclude that the district court erred either in finding a knowing and voluntary waiver or in continuing the trial in the defendant's absence, we must consider whether the error was harmless in light of the record as a whole. *Fontanez,* 878 F.2d at 35; *see Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) (A violation of Rule 43 "may in some circumstances be harmless error."); *Chapman v. California,* 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967) (error will be considered harmless if it did not contribute to the verdict).

### B.

Following the approach we have just described, we first address the issue of whether the district court determined correctly that there was a knowing and voluntary waiver of the right to be present at trial on the part of the defendant. Our review of this matter is, we must regretfully note at the outset, greatly hampered by the abbreviated proceedings in this district court. Indeed, it is the brevity of these proceedings that requires, in significant measure, the result that we must finally reach today.

■ At least since the watershed opinion of Justice Cardozo in *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), federal courts have recognized two grounds that might justify the absence of the defendant. In *Snyder,* the Justice noted that a defendant in a criminal case may lose the right to be present at trial either "by consent or at times even by misconduct." *Id.* at 106, 54 S.Ct. at 332. While these two bases, consent and misconduct, are analytically independent,[7]

---

**7.** In our day, the basic distinction is reflected in Rule 43 of the Rules of Criminal Procedure:

    **(b) Continued Presence Not Required.** The further progress of the trial to and including

the return of the verdict shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present,

it must be remembered that consent need not be explicit. It may be implicit and turn, at least in part, on the actions of the defendant.[8] Therefore, while, in determining consent, the district court ought always to attempt to secure explicit evidence of the defendant's wishes,[9] it may also base its conclusions on the defendant's actions.

In this case, it is clear that the district court based its conclusion not solely on misconduct but on a determination, from the totality of the circumstances, that the defendant had consented to his absence from the trial proceedings. We have no quarrel with this characterization; nor do we take issue with the court's belief that it could take into consideration the defendant's out-of-court statements and conduct, as well as in-court conduct, in making that determination. It was also proper for the court to take into consideration the testimony of the psychologist who had testified on specific intent during the hearing on the motion in limine.

Nevertheless, we think it is clear that, when the district court directed the removal of the defendant at the end of the three-minute hearing, it did not have a sufficient basis to justify the conclusion that the defendant had knowingly and voluntarily consented to the waiver of his right to be present at trial. At that point, the district court had no reliable information about the events of that morning at the MCC. Indeed, the court, quite candidly, had described that information as "third-degree hearsay." Tr. at 10. The defendant's conduct in the courtroom was completely passive and susceptible to several interpretations. Moreover, while the district court had every right to rely upon the testimony from the hearing on the motion in limine to interpret the conduct it had observed and that had been reported to it, that testimony, evaluated in its totality, raised as many questions as it answered. While the psychologist had testified that the defendant was, as a general proposition, able to stand trial, he had also noted that Mr. Watkins was susceptible to psychotic episodes of limited duration and suggested as well that such episodes occur when Mr. Watkins feels threatened. Therefore, a fair evaluation of the medical testimony available at the time of the three-minute hearing would not support a determination of knowing and conscious waiver. This is especially true because the district court did not, at any point, address the defendant directly and attempt to ascertain whether he understood that his actions were being construed as a waiver of his right to be present. Accordingly, we must conclude that, at the time the district court ordered the exclusion of the defendant from the courtroom and announced its intention to proceed without him, there was an inadequate basis in the record to justify such a decision. Neither the "third-degree hearsay" about the events in the MCC nor the testimony of the day before provided, without further verification and amplification, an adequate explanation for the ambiguous demeanor of the defendant in the courtroom during the three-minute session at which he was present.

The district court appears to have shared our view with respect to the infirmity of the proceedings, or at least to have had misgivings about it. The court announced, immediately upon the resumption of the proceedings, that it intended to "have the marshal to whom the defendant spoke this morning come in and state on the record what the defendant said to him this morning...." Tr. at 8–9. Indeed, when the court had disposed of the remainder of the business that it had planned for the day, including extensive further proceedings in

---

(1) is voluntarily absent after the trial has commenced (whether or not the defendant has been informed by the court of the obligation to remain during the trial), or

(2) after being warned by the court that disruptive conduct will cause the removal of the defendant from the courtroom, persists in conduct which is such as to justify exclusion from the courtroom.

**8.** *See Taylor,* 414 U.S. at 20, 94 S.Ct. at 196 (inferring consent from an admittedly voluntary departure during trial).

**9.** *See United States ex rel. S.E.C. v. Billingsley,* 766 F.2d 1015, 1020 (7th Cir.1985) (preferred practice is to obtain a clear and knowing waiver on the record).

this case, it took testimony from the officer and the MCC psychologist (not the person who had testified the day before at the hearing on the motion in limine) about the relevant events. We do not believe that these proceedings, held after the defendant had already been excluded from a significant portion of his trial, can be considered to have cured the defect in the earlier proceedings. The record makes it clear that, despite its responsibility to proceed cautiously when the defendant is in custody, *see Larson v. Tansy*, 911 F.2d 392, 397 (10th Cir.1990), the district court made no effort to hold these later proceedings in the presence of the defendant. First of all, the record indicates that the court made no effort to ascertain whether this testimony could be taken while the defendant was still in the courtroom. The officers were in some proximity to the court; it may well have been possible to procure their presence during a brief recess. Proceeding in such a manner would have permitted the defendant to be present while the matter of his consent to trial in his absence was thoroughly aired. While he had not been responsive during the three minutes when he was present in the courtroom, his counsel may well have been able to induce him, upon confrontation with the testimony of the officers, to present his own account or to assist counsel in the cross-examination of these witnesses. Moreover, even if the defendant had remained passive throughout the taking of this testimony, his presence would not have been disruptive. Because these proceedings were conducted without a jury present, the defendant's "passive-aggressive" behavior, as the government characterizes it, would have had no effect on the later presentation of the case to the jury.[10] Here, the district court's decision not to take the testimony of the MCC officers before the removal of the defendant appears to have been driven in large measure by a desire to adhere to the day's preset schedule. We can appreciate the need of a court as pressed by caseload as this one to require a high degree of cooperation from all who come before it. However, the facts of record in this case, which present no particularly pressing need for rigid adherence to the preset schedule, do not present a sufficiently weighty concern to justify the court's failure to attempt to determine the voluntariness of the defendant's waiver in his presence.

When the court did return to this issue in the late afternoon, it made no attempt to ascertain whether the defendant wished to be present while the court heard the testimony of the MCC officers who had reported to the court that he had refused to come to court that morning. The testimony of the officers *can* be read to be somewhat supportive of the district court's conclusion.[11] However, we do not believe that it can cure the defect in the earlier hearing, not only because the district court never afforded the defendant an opportunity to be present and to assist his counsel, but also because the court never made any findings with respect to this testimony. Most notably, the court never explicitly reconciled this testimony with the testimony of the psychologist who had testified the day before, at the hearing on the motion in limine, about the defendant's psychiatric instability.

Even if we could sustain the district court's determination that a knowing and conscious waiver had taken place, we could not sustain, on the record before us, the district court's laconic treatment of whether the public interest demanded that the

---

10. We have no need to determine in this case under what circumstances such passive behavior might be considered disruptive if a jury were present.

11. Dr. Pindelski testified in pertinent part:
    He referred back to the conversation we had yesterday when I talked with him upon his return from court. So he was in, his memory for recent remote events I assessed to be good based upon those facts. He knew who I was, and he knew his circumstances. He was well-oriented in that regard.
    Some of his verbalizations, at one point he said, "If taken to court I will strip down and be butt-naked in the courtroom." And that is a direct quote. I don't recall all the other statements that he made; there were numerous.
    Tr. at 90–91.

proceedings be continued in the defendant's absence. In the particular factual context before us, many of the factors we must consider are the same as those we examined with respect to the voluntariness of the waiver.

After the district court had excluded the defendant from the morning session, the district court made a conclusory statement that "it is clearly in the public interest to proceed with the trial in a case where a defendant attempts unilaterally to obstruct proceedings." Tr. at 9. However, the court gave no indication that it had weighed the various factors. In this case, as we have noted, Mr. Watkins' presence, at least while a jury was not present, presented no clear impediment to the proceedings. The jury had not yet been selected, and the venire had been delayed only slightly longer than an hour. The trial was to be a brief one, and there was no finding that it could not be delayed for a reasonable time in order to resolve the issue of voluntariness in the presence of Mr. Watkins. The government concedes that its witnesses were from Chicago. Only Dr. Foster, Mr. Watkins' own expert, would have had to travel from another state. In short, the record does not indicate that the public interest required a trial in absentia. While we concur with our colleagues in the Second Circuit that the weighing of the *Tortora* factors in a single defendant case need not be a long or involved process, *see Sanchez*, 790 F.2d at 250–51, there must be a *process* of evaluation. This record evidences nothing other than dissatisfaction that the court could not adhere rigidly to a preset schedule.

The government maintains that, even if the district court erred in finding waiver or in trying Mr. Watkins in absentia, the error is harmless beyond a reasonable doubt and failed to create "any reasonable possibility of prejudice." *United States v. Toliver*, 541 F.2d 958, 964–65 (2d Cir.1976) (citing *Walker v. United States*, 322 F.2d 434, 436 (D.C.Cir.1963), *cert. denied*, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964)). This standard of review puts a heavy burden on

government. *See Chapman*, 386 U.S. 18, 87 S.Ct. 824 (1967).

In attempting to carry this burden, the government asserts that failure to remove Mr. Watkins would have resulted in more prejudice to his case. Had Mr. Watkins remained throughout trial in his prone posture, the government submits, his "state of disarray" would have prejudiced him before the jury, and would have been the equivalent of presenting him to the jury bound and gagged. Appellee's Br. at 38. We are not persuaded that the government has borne its burden. As we have already noted, it cannot be presumed, on this record, that, had the district court proceeded in a more measured fashion, the defendant ever would have appeared before a jury in such a state. After a full and fair hearing in his presence, the matter of Mr. Watkins' consent would have been decided. If the court had held that he had knowingly and voluntarily waived his right to be present, he would have been excused properly. If the court had determined he had not waived his right to be present, and if Mr. Watkins' conduct had jeopardized the fairness of the proceedings, it would have been incumbent on the district court to warn him that persistence in that conduct would constitute an independent ground for removal. *See* Fed.R.Crim.P. 43(b)(2). If he persisted, removal on the independent ground of disruptive conduct might have been possible.[12]

### Conclusion

Because we find that the district court acted precipitously and prematurely in determining that Mr. Watkins had voluntarily and knowingly waived his Sixth Amendment right to be present at trial and because we cannot conclude that this was harmless error, we must reverse the conviction and remand for a new trial.

REVERSED AND REMANDED.

EASTERBROOK, Circuit Judge, dissenting.

Harry Watkins declined to attend his trial. He would not come out of his cell.

12. *See supra* note 10.

Watkins told the prison's chief psychologist on the morning trial was to begin: "It's principles, I refuse to go to court." He and the psychologist had had a similar conversation the day before, with Watkins asserting that "on principle" he would refuse to attend and that "[i]f taken to court I will strip down and be butt-naked [sic: buck naked?] in the courtroom." Prison administrators would not take "no" for an answer. Guards dragged Watkins out of his cell. Watkins swore at them and resisted by going limp. The guards dressed Watkins and dumped him into a wheelchair. Marshals trundled him off to court, where he refused to speak with his attorney. In the courtroom Watkins did his best imitation of a sack of flour, slumping forward with his head on the table. The district court removed Watkins from the courtroom and the trial proceeded to a verdict of guilty—which my colleagues reverse because they conclude that the record does not establish, with sufficient clarity, a waiver of the right to be present during trial. Watkins was mute, and muteness is not waiver. Yet we know that a defendant waives his right to be present by the simple act of not showing up. *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); Fed.R.Crim.P. 43(b). No need for elaborate warnings and waiver on the record. Watkins did what he could to stay home, failing only because the guards dragooned him. It is bizarre to reverse a district judge for simultaneously accommodating a defendant's wishes and preserving decorum in court.

Watkins is an intelligent, educated person. For almost six years he worked as a taxpayer service representative with the Internal Revenue Service. There are two ways to understand his behavior: (1) he did not want to attend his trial; (2) he was suffering from mental problems that left him unable to make an informed choice. If the former, the verdict should stand; if the latter, the mental instability requires a retrial. Which is it? Obviously Watkins has mental problems. The nature of his crime and the unorthodox method he chose to communicate his wish show as much. A psychiatrist and a psychologist, one re-

tained by each side, examined Watkins. At a hearing the day before trial began, they agreed that Watkins could understand the proceedings and assist in his own defense. One testified that any psychotic episodes were of short duration and characterized by "a reflexive response when [he] feel[s] threatened to try to run people off". The judge declared Watkins fit for trial. Whatever one can say about Watkins' conduct the next day, it was not a "reflexive response" of short duration characterized by aggressive behavior. For three days Watkins had been fasting, announcing to the guards and the prison psychologist his wish to skip the trial. After his exclusion from trial, he did not ask to return; he has never said that the judge interpreted his actions incorrectly. Nothing about this sequence of events implies that Watkins was for a brief period unable to control his actions or appreciate their significance. That leaves explanation (1): Watkins made a conscious choice, which, although communicated in an inappropriate manner, was a decision nonetheless.

Bypassing the question whether Watkins waived (or at least forfeited) his right to be present at trial, my colleagues criticize the district judge's handling of the situation. The criticisms take several forms but reduce to "dissatisfaction that the court ... adhere[d] rigidly to a preset schedule." At 1422. In other words, the district judge resisted Watkins' attempts to disrupt orderly judicial processes—and a majority reverses because it believes that the judge should have permitted the gambit to succeed! Is there a difference between a "preset schedule" and any old schedule? A "schedule" is a timetable established in advance. At all events, I understand the refrain "adhere rigidly to a preset schedule" as derogatory. Why should we belittle efforts to accommodate jurors, witnesses, and lawyers, all of whom, like the judge, have other things to do? Judges must apportion time among the many claimants and reduce the tax the judicial process imposes on the lives of others, some of whom are victims of crime and others of whom assist in the determination

of cases. When some litigants appropriate more time by behaving like spoiled brats, litigants who observe the rules receive less. Dignity in court serves important functions unrelated to the allocation of time. Persons who impede the operation of a court—that is, who by misconduct divert judges from their "preset schedule"—may be imprisoned summarily for contempt. *United States v. Wilson*, 421 U.S. 309, 315–18, 95 S.Ct. 1802, 1806, 44 L.Ed.2d 186 (1975); *In re Chase*, 468 F.2d 128, 136 (7th Cir.1972). How is it, then, that minimizing disruption becomes a ground of reversal?

As it happens, the judge did not "adhere rigidly to a preset schedule". Watkins was not present at 9:00 A.M., when the trial was supposed to begin; his antics delayed his arrival. The judge heard from counsel at 9:45 A.M. After a recess, during which the judge did legal research, Watkins appeared in person at 10:12 A.M. and demonstrated the conduct that had been described to the judge. Jury selection started 81 minutes late. Immediately after lunch the judge returned to the subject. Still a fourth interruption, later that afternoon, was devoted to the testimony of the guards and prison psychologist. Not much by way of trial was accomplished that first day, a fact illustrated by the page numbers of the transcript. Only 93 pages (25 concerning Watkins' conduct) were needed to record the proceedings, compared with 200 or more for a normal trial day. A one-day trial turned into a two-day trial. If this is "adher[ing] rigidly to a preset schedule", then I have lost my grip on the English language.

A reader of the majority's opinion might think that the question is whether Watkins' impersonation of Raggedy Andy for three minutes is "misconduct" sufficient to justify exclusion under *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Not at all. Allen sought to attend and disrupt his trial. Our questions are whether Watkins wanted to attend the trial at all and, if not, whether that preference was the product of volition as opposed to mental disability. A hearing the day before trial concerning Watkins' mental state, coupled with the testimony of the prison psychologist that Watkins was alert and in command of himself when he refused to emerge from his cell on the morning of trial, show that Watkins is accountable for his decision. Whether a person surrendered his right to attend the trial is a question of fact, and appellate review is deferential. Judge Conlon's finding that Watkins did not want to attend the trial is not clearly erroneous; it is all but compelled by the record. If, as the majority believes, the judge neglected to make findings with sufficient detail, we should remand for that purpose rather than reverse the conviction.

What remains is the possibility that the record was not properly assembled. During the afternoon session at which the guards and psychologist testified about the events at the prison, Watkins was absent. The majority points out that he could have been produced and speculates that "his counsel may well have been able to induce him, upon confrontation with the testimony of the officers, to present his own account or to assist counsel in the cross-examination of these witnesses." At 1421. Anything is possible in a world of quantum mechanics. Is this probable? Once again recall that Watkins himself has *never* said anything of the kind. At the close of the first day, the judge issued an invitation to return; Watkins stayed put. My colleagues fear that the invitation may not have reached Watkins' ears or might not have sunk in, but Watkins has never denied receiving and understanding the judge's words. What is more, there has been time and notice aplenty since trial, yet Watkins has not asked for a hearing. He did not produce an affidavit stating what he would have done had he been present. He does not provide any facts that contradict or add perspective to the testimony. Indeed, as I keep repeating, he has never once said or even intimated that he wanted to be present for a single instant of the trial or ancillary proceedings.

The only way to have assembled the record in Watkins' presence during the afternoon would have been to drag him to court a second time. Must a court coerce the

accused's presence? It *may* do so; a defendant has no right to trial in absentia. *Taylor*, 414 U.S. at 20, 94 S.Ct. at 196; *Diaz v. United States*, 223 U.S. 442, 457, 32 S.Ct. 250, 254, 56 L.Ed. 500 (1912); Rule 43(a). But coercion is not obligatory. Proceedings may continue if the accused is "voluntarily absent after the trial has commenced (whether or not the defendant has been informed by the court of the obligation to remain during the trial)". Rule 43(b)(1). Watkins was present at the outset, see *Crosby v. United States*, —— U.S. ——, 113 S.Ct. 748, 122 L.Ed.2d 25 (1993), which is all the rule requires. I would worry about the circularity of saying that Watkins did not want to attend the hearing—when his desires were the thing to be inquired into—if he had dropped a clue that he wanted to be there, or if he had questioned the accuracy or veracity of the testimony given in his absence. He has done none of these things, and the court was entitled to respect his wishes.

Watkins will receive the court's opinion in ill humor, I expect. He wanted to sit out the trial and avoid conviction. He achieved the first but not the second, and now we give him the second but not the first. His sentence was ten months' imprisonment, which he has completed. There will be no retrial unless the prosecutor is sufficiently vindictive to want Watkins to spend a few more months on supervised release. No one is well served by this disposition—not Watkins, confined to prison without a clear outcome to the charges; not the recipients of his threats, deprived of such balm as a conviction of their torturer supplies; and not the judicial system, which loses an important part of its ability to carry on in the face of guerrilla warfare by defendants.