**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 93-7769
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FLOYD DAVIS, RODNEY DAVENPORT, a/k/a "Fella",
PERRY WILLIAMS, a/k/a "Tic," JAMES EDWARD JEFFERSON,
a/k/a "Peanut," and MARY McBRIDE,
a/k/a "Mary Jefferson,"

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
_____

August 2, 1995

Before WISDOM, GARWOOD and DAVIS, Circuit Judges.

DAVIS, Circuit Judge:

Appellants Floyd Davis ("Davis"), Rodney Davenport

("Davenport"), Perry Williams ("Williams"), James Edward

Jefferson ("Jefferson") and Mary McBride ("McBride") were jointly

tried before a jury and convicted of various drug trafficking

offenses stemming from a conspiracy to distribute cocaine and

cocaine base.  All five appeal their convictions.  Finding no

reversible error, we affirm.

## I. FACTS

From 1989 to 1992, appellant Jefferson ran a large narcotics

distribution organization in Greenville, Mississippi.  The

organization consisted of over twenty members who worked under

Jefferson's direction to distribute cocaine, cocaine base and marijuana. Jefferson owned and operated a bar called "The Side Effect," which served as a front for his organization. From The Side Effect, Jefferson directed a phalanx of street dealers who sold drugs around the clock. Jefferson also supervised the cooking of the cocaine into cocaine base at the house of his mother, appellant Mary McBride. Additionally, he arranged and directed several trips to pick up drugs from various source cities around the country.

In June 1991, McBride was arrested in Miami on one of these trips while obtaining thirty kilograms of cocaine. In August 1991, another member of the Jefferson organization was apprehended while attempting to transport two kilograms of cocaine from California to Greenville. Additionally, appellant Davis, who supplied narcotics to the Jefferson organization, was apprehended in Nevada en route from his home in California to Greenville with over three ounces of cocaine and some marijuana.

On March 19, 1992, a reverse sting operation was initiated in Greenville by undercover agents posing as drug dealers. Jefferson sent Jerry and Edward Kyser to meet with agents at the Alamatt Motel to purchase cocaine. Prior to the meeting, Jefferson directed Edward Kyser to withdraw nearly $7000 from The Side Effect checking account. Jefferson gave Kyser additional money in a paper bag. Jefferson also gave Jerry Kyser a nine-millimeter pistol to take with him to the meeting. When the Kysers arrived at the Alamatt Motel and tendered the purchase money, the agents arrested them. Following their arrest, the

Kysers agreed to cooperate with the government and consented to tape-record three telephone conversations with Jefferson.

The investigation led to a seven-count indictment against twenty defendants for various drug and firearms violations. Count One charged all five appellants and fifteen other defendants with conspiracy to possess with intent to distribute and distribution of in excess of five kilograms of cocaine and cocaine base, in violation of 21 U.S.C. § § 841 and 846. Count Two charged Jefferson with unlawfully engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848. Count Three charged Jefferson with attempted distribution of cocaine and marijuana, in violation of 21 U.S.C. § 846. Counts Four through Seven charged Jefferson with the use of a firearm during and in relation to a drug trafficking offense and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § § 924(c) and 922(g).

After fifteen co-conspirators pleaded guilty, the government proceeded to trial against the five appellants. The jury returned verdicts of guilty against the appellants on all counts charged. The district court then sentenced Jefferson to life plus five years imprisonment;[1] Davis, McBride and Williams to life imprisonment; and Davenport to 292 months imprisonment. The appellants raise numerous issues on appeal, which we consider

---

[1]     The court sentenced Jefferson to life on both the CCE and possession with intent to distribute cocaine and marijuana charges (Counts 2 and 3); to a concurrent ten-year sentence on the three charges of unlawful possession of a firearm by a felon (Counts 5-7); and to a consecutive term of five years for the use of a firearm during and in relation to a drug trafficking crime (Count 4).

below.

## II. SUFFICIENCY OF THE EVIDENCE

Jefferson and Davenport complain that the evidence is insufficient to support their convictions.[2]  In reviewing a claim for insufficiency, we determine whether, based on the totality of the evidence at trial, any rational trier of fact could have found that the government proved the essential elements of the crimes charged beyond a reasonable doubt.  United States v. Nguyen, 28 F.3d 477, 480 (5th Cir. 1994).  In doing so, we view the evidence in the light most favorable to the verdict.  Id.

### A. Davenport

Davenport argues that the evidence was insufficient to show his knowledge and participation in the conspiracy.  He contends that the government portrayed him as a mere "street dealer" and failed to present any evidence establishing his ability to exercise dominion or control over other members of the conspiracy, his participation in the management of the conspiracy, or his knowledge of the details of the conspiracy.

The government presented evidence, beyond mere presence and association, to support Davenport's conviction.  Ten co-conspirators testified about Davenport's role in the organization. The testimony established not only that he was a regular street

_____

[2]    Only Davenport and Jefferson specifically challenge the sufficiency of the evidence supporting their convictions. Although all the appellants moved to adopt any issues raised by a co-appellant, sufficiency arguments are too individualized to be generally adopted.  Although our review of the record persuades us that the evidence is sufficient to support the convictions of all appellants, we discuss sufficiency only with respect to Jefferson and Davenport.

dealer for the organization, but also that he collected money from and distributed packets of cocaine to the other street dealers, picked up guns for Jefferson, and accompanied a group of co-conspirators to beat up a man who allegedly stole drugs from Jefferson. The evidence also showed that Davenport had signatory privileges at Sunburst Bank for The Side Effect account. Furthermore, Antoine Gilmore testified that he and Davenport occasionally ran the business when Jefferson was out of town. Viewing the evidence in the light most favorable to the verdict, a rational jury could have concluded that Davenport was guilty on the conspiracy count.

### B. Jefferson

#### 1. The CCE Conviction

Jefferson first challenges the sufficiency of the evidence to support his CCE conviction. The governing provision, 21 U.S.C. § 848(b), provides that a person engages in a CCE if:

> (1) he violates any provision of [title 21] the punishment for which is a felony, and
>
> (2) such violation is part of a continuing series of violations of [title 21]--
>
>> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>>
>> (B) from which such person obtains substantial income or resources.

The testimony established that Jefferson was the leader of a large cocaine distribution conspiracy that ran from 1988 to 1992, employing more than twenty people at any given time and making up to $6000 daily. Jefferson argues that his conviction should

5

nevertheless be reversed because the evidence against him primarily consisted of the testimony of ten accomplices, all of whom had accepted plea bargains from the government in return for testifying.  This argument lacks merit.

It is well-settled that credibility determinations are the sole province of the jury.  See, e.g., United States v. Bailey, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").  We have held that "[a] conviction may rest solely on the uncorroborated testimony of one accomplice if the testimony is not insubstantial on its face." United States v. Gibson, 55 F.3d 173, 181 (5th Cir. 1995) (citing United States v. Gardea Carrasco, 830 F.2d 41, 44 (5th Cir. 1987)). Jefferson's role in the enterprise was corroborated by taped telephone conversations and financial data from The Side Effect, bank records and Western Union records.  The abundant evidence concerning Jefferson's role in the conspiracy and the income he derived from it was sufficient to support the CCE conviction.

2.  The Firearms Convictions

Jefferson next challenges his four firearms convictions (Counts 4-7).  Count 4 charged Jefferson with aiding and abetting the carrying and use of a firearm during and in relation to the March 19, 1993 drug deal at the Alamatt Motel, in violation of 18 U.S.C. § 924(c).  To establish an offense under § 924(c), the government need not prove that the defendant used, handled or brandished the weapon in an affirmative manner, but rather need only prove that the firearm was available to provide protection to

6

the defendant in connection with the drug trafficking offense. See United States v. Rocha, 916 F.2d 219, 237 (5th Cir. 1990), cert. denied, 500 U.S. 934 (1991). To sustain a conviction of an aiding and abetting offense, the government must show that the defendant associated with a criminal venture, participated in the venture and sought by action to make the venture succeed. United States v. Stone, 960 F.2d 426, 433 (5th Cir. 1992).

The firearm in question, a Stallard Arms Model JS nine-millimeter semi-automatic pistol, was taken from co-conspirator Jerry Kyser after the reverse sting operation at the Alamatt Motel. The gun was available to Kyser during that transaction to use should the need arise. Kyser testified that Jefferson had engineered the Alamatt Motel meeting and had furnished the firearm to Kyser for protection during that transaction. From this evidence, a rational jury could have found that the government proved the elements of the § 924(c) offense beyond a reasonable doubt.

Counts 5-7 charge Jefferson with violating 18 U.S.C. § 922(g)(1), which makes it unlawful for a convicted felon to "possess in or affecting commerce, any firearm or ammunition." Count 5 refers to the same pistol discussed above, which was seized from Jerry Kyser at the Alamatt Motel. Count 6 refers to a Smith & Wesson Model 1006 ten-millimeter semi-automatic pistol seized by agents from under Jefferson's mattress during a search of his residence. Count 7 refers to a Ruger Model P-85 Mark II nine-millimeter semi-automatic weapon with laser sight seized from Antoine Gilmore during a search of The Side Effect.

7

Jerry Kyser testified that Jefferson gave him the Stallard to take to the Alamatt Motel and that he had seen Jefferson on prior occasions with the Smith & Wesson. Antoine Gilmore testified that Jefferson gave him the Ruger to protect the business from other drug dealers. Again, Jefferson's only challenge is that these witnesses are not credible. This argument was for the jury, which obviously did not accept Jefferson's argument. The evidence was sufficient to support the firearms convictions.

### III. MOTION FOR CONTINUANCE

All five appellants challenge the district court's denial of their eleventh-hour motion for a continuance, arguing that they were prejudiced by their counsel's inadequate time to prepare. Specifically, they argue that they lacked time to investigate more than eighty potential witnesses included on a list of unindicted co-conspirators furnished to them by the government four days prior to trial.

In determining whether to grant a continuance, the district court "examine[s] the totality of the circumstances," including the amount of time available for preparation, the defendant's role in shortening the time needed, the complexity of the case, the availability of discovery from the prosecution, the adequacy of the defense actually provided at trial, and the likelihood of prejudice from the denial. United States v. Webster, 734 F.2d 1048, 1056 (5th Cir.), cert. denied, 469 U.S. 1073 (1984). We review the denial of a motion for continuance for an abuse of discretion. Id.

On April 12, 1993, the magistrate judge assigned to the case granted defendant Davis' Motion for a Bill of Particulars,

8

requiring the government to furnish Davis the names and addresses of any unindicted co-conspirators. The government filed a motion to stay the order pending a ruling on its motion to disqualify Davis' counsel. On May 21, 1993, the district court disqualified Davis' original counsel, and on May 25, the magistrate granted the government's motion to stay but directed the government to furnish the Bill of Particulars within five days after an appearance by Davis' new counsel. On July 26, after Davis had acquired new counsel, the government urged the magistrate to reconsider the previous order granting the Bill of Particulars in light of his July 21 order denying a similar motion for a Bill of Particulars filed by McBride. On September 7, six days before the trial was scheduled to begin, the magistrate denied the government's motion to reconsider.

The following day, the government filed a list of all individuals who could conceivably be characterized as unindicted co-conspirators.[3] It simultaneously filed an application for review of the magistrate's order with the district court. On September 14, 1993, after the trial had commenced, the district court overruled the magistrate's order granting the Bill of Particulars and denied the defendants' request for a continuance.

The appellants do not challenge the district court's order overruling the magistrate's ruling. Rather, they argue that even if they were not entitled to the list of co-conspirators in the first place, once they received it, they were obliged to talk to

---

[3] The government asserts that it provided an expansive list to avoid exclusion motions during the trial based on alleged violations of the magistrate's order.

9

these potential witnesses.  As an initial matter, we doubt that the appellants can complain about lack of time to talk to witnesses whose names were provided in a list that they were not entitled to in the first place.  Moreover, even if the appellants can make this argument, they have failed to show any prejudice resulting from their inability to investigate the list.  The government assured the district court and defense counsel that none of the unindicted co-conspirators named on the list would provide direct evidence against the defendants at trial.  The appellants point to no instance in which the government violated this promise.  At most, two people on the list, Falicia Gray and Ronnie Gilmore, were called as witnesses, but the defense was previously aware of both of these witnesses.  In sum, the district court did not abuse its discretion in denying the motion for continuance. Also, appellants point to no prejudice from the court's refusal to continue the trial.

IV.   PROSECUTORIAL MISCONDUCT

Jefferson next challenges certain statements made by the prosecution during closing argument.  Jefferson's counsel in closing argued that no evidence was presented against Jefferson except the testimony of "crackhead copouts."  In rebuttal, the prosecution responded that drug notes found in Jefferson's home corroborated the accomplices' testimony.  Jefferson argues that this argument was improper.

The notes referred to in the prosecution's closing argument were admitted into evidence without objection as part of a bag of assorted papers found in Jefferson's bedroom during a search of his

home.  The hand-written notes contained instructions on how to run the drug operation and avoid problems with the police.  The prosecutor argued that because the notes were found in Jefferson's bedroom, one could reasonably conclude that they were Jefferson's notes instructing his subordinates on the finer points of evading police detection.  The defense objected on the basis that no evidence had been presented at trial to prove that Jefferson was the author of the notes.  The court twice cautioned the jury that no direct evidence of authorship was presented, and the jury could not consider the notes unless it concluded from the totality of the evidence that Jefferson wrote them.

We conclude that the prosecution's remarks were not improper.  The fact that the notes were found in Jefferson's bedroom creates a reasonable inference that they belonged to Jefferson and that he knew their contents.  The district court's cautionary instructions gave proper directions to the jury to first decide whether the notes belonged to Jefferson before they considered them as evidence against him.

## V.  MOTION TO SUPPRESS

Davis challenges the district court's denial of his motion to suppress three ounces of cocaine seized during a traffic stop in Nevada from a truck in which Davis was a passenger.  Prior to trial, Davis moved to suppress the evidence as fruit of an illegal search.  Following a hearing, the district court denied the motion to suppress, finding that the arrest was lawful and that Davis had consented to the search.

We review the district court's findings of facts for clear

11

error and questions of law de novo. United States v. Shabazz, 993 F.2d 431, 434 (1993). "[W]here the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses." United States v. Kelley, 981 F.2d 1464 (5th Cir.) (citations omitted), cert. denied, 113 S. Ct. 2427 (1993).

Nevada State Trooper Rozell Owens testified at the suppression hearing that he stopped the red Mitsubishi truck in which Davis was travelling for speeding. He also testified that he had received information that a truck matching that vehicle's description and bearing the same license number might be transporting narcotics along Interstate 15. According to Trooper Owens, Davis, who was a passenger in the vehicle, told the officers that the truck belonged to his wife. Trooper Owens testified that Davis was sweating and could not stand still. Owens further testified that upon asking Davis whether there was a drug problem in his community, Davis became highly emotional, yelling at the Officer. Owens then asked Davis for permission to search the car. According to Owens, Davis replied that he had "no problem" with Owens searching the car. Owens testified that under the passenger's seat, he found a grey woman's purse that contained two bags of cocaine. In the cab, he also found an address book that contained a few entries for "Peanut." Davis corroborated the Officer's testimony up until the moment of consent. However, he denied consenting to the search and insisted that Owens planted the purse with the cocaine in the truck after ordering Davis to look away.

12

The stopping of a vehicle and the detention of its occupants is a "seizure" under the Fourth Amendment and therefore must be reasonable. Shabazz, 993 F.2d at 434. Where, as here, the defendants are stopped for violating the traffic laws, the courts have analyzed the case under Terry v Ohio, 392 U.S. 1 (1968). Id. at 435.

Davis cannot argue that the initial stop of the truck for speeding was improper. See id. at 435. Thus, his argument as to the illegality of the stop must be predicated on the further detention and questioning, including the request for consent to search the truck. See id. This court has rejected the notion that mere questioning during a traffic violation stop, even on a subject unrelated to the initial purpose of the stop itself, is a violation of the Fourth Amendment. Id. at 436. Such questioning is reasonable if the detention continues to be supported by the facts justifying the initial stop. Id. at 437 (finding no constitutional violation where officer asked for consent to search vehicle while waiting for results of routine computer check after stopping car for speeding).

Davis does not argue that he was detained any longer than the usual time needed to issue a citation for speeding. Thus, the detention was not illegal. See Kelley, 981 F.2d at 1470. Moreover, Davis does not argue that the consent was not voluntary but rather contends that he never gave consent. The district court, however, credited Owens' testimony (which was corroborated by fellow trooper, Jack Snyder) and found that Davis consented to the search. This finding is not clearly erroneous. The district

13

court properly denied Davis' motion to suppress the search.

VI.   PROCEEDING WITH THE TRIAL IN McBRIDE'S ABSENCE

McBride argues that her conviction should be reversed because the district court improperly proceeded with the trial in her absence.  The trial commenced on September 13, 1993.  McBride attended the first week of trial, in which a great deal of evidence was presented against her and  her co-defendants.  When court reconvened on Monday, September 20, 1993, McBride was not present.  McBride's counsel, Mr. Lanigan, stated that McBride's family had called him Sunday night to tell him that McBride had checked into the emergency room of Delta Regional Medical Center in Greenville.  Counsel, however, had not been able to contact her physician, Dr. Estess.  The government reported that it had learned that McBride had checked into the hospital on Sunday evening after allegedly ingesting fifty antidepressant pills in an apparent suicide attempt.  The government then moved that the court find McBride voluntarily absent under Fed. R. Crim. P. 43(b).

The court granted a recess to allow Mr. Lanigan to talk to his client and Dr. Estess.  Following the recess, Mr. Lanigan stated that he had reached Dr. Estess, who had informed him that McBride would receive a routine mental evaluation on Tuesday and be released by Wednesday.  Apparently, the court also talked to Dr. Estess and confirmed the report.

The district court found that McBride's ingestion of the fifty pills was voluntary under Fed. R. Crim. P. 43 and that she had therefore waived her right to be present at trial.  The court further found that the public interest in proceeding with the trial

14

outweighed McBride's interest in being present. In making this determination, the court considered the multi-defendant nature of the case; that witnesses had been subpoenaed from Florida and Nevada; that twenty-five witnesses had already testified; and that the jury was district-wide, with some jurors travelling over 100 miles a day.

However, in an abundance of caution, the court ruled that it would not hear any evidence implicating McBride for the remainder of the day and that after Monday's testimony, it would grant a continuance until Wednesday to give defense counsel time to resolve the situation. The Miami evidence, which implicated McBride, was slated for Wednesday. The district court also strongly advised counsel to visit McBride and inform her that she needed to be present at trial, that she had a right to be present, and that the evidence against her would proceed in her absence if she did not return by Wednesday.

When the court reconvened on Wednesday, McBride's counsel filed a motion to reconsider the court's finding that McBride was voluntarily absent. Counsel informed the court that McBride had not yet been released from the hospital because of "additional complications." He stated that he understood from Dr. Estess that she would be released Wednesday afternoon or Thursday morning. Counsel further stated that he had visited McBride and that she was "in relatively good spirits." McBride had told him she would come to the trial if she was "mentally and physically able."

The parties then suggested that the court contact Dr. Estess, as no one was certain as to McBride's exact condition. The court

15

agreed and spoke to Dr. Estess. The district judge reported to counsel that Dr. Estess told him that McBride was still hospitalized and that she had "a lot of vague complaints . . . that he was having trouble verifying, but he needed to attempt to verify." The doctor informed the court that McBride would probably be discharged the next day, though he could not be certain.

The court then reconfirmed its finding that McBride's absence was voluntary. In light of the complicating factors caused by the multi-defendant trial and the uncertainty as to McBride's release, he also reconfirmed his decision to proceed with the trial in her absence. The trial proceeded and was completed on Wednesday, September 23, when the jury returned a verdict. On September 24, the court ordered that McBride be taken into custody and be transferred to the federal medical facility in Lexington, Kentucky for a full physical and mental evaluation.

On December 29, 1993, the court held a hearing on McBride's motion for new trial. The court made it clear that the hearing would address the issue of whether McBride's absence was voluntary. However, McBride elected not to testify at the hearing. At the hearing the government called Harold Duke, counsel for Davenport. Mr. Duke testified that he and Davenport were standing in the hallway outside the courtroom at the conclusion of the first week of the trial, discussing whether Davenport planned to stay in Oxford, where the trial was, or return to Greenville for the weekend.[4] McBride, who was also standing in the hallway, indicated

---

[4] Davenport and McBride were the only defendants released on bail.

16

that she was going to Greenville. When Davenport asked McBride if she were coming back to Oxford on Monday, McBride replied, "Naw, I'm not coming back." Mr. Duke testified that at the time he understood her remark to be humorous. After hearing this evidence, the district court denied McBride's motion for a new trial, reiterating his reasons for proceeding in McBride's absence.

McBride challenges the district court's decision to proceed with the trial in her absence on two grounds: (1) that the court erred in determining that she was voluntarily absent under Fed. R. Crim. P. 43(b); and (2) that the court erred in failing to hold, sua sponte, a competency hearing before determining that she had waived her right to be present. We conclude that both arguments fail.

### A. VOLUNTARY ABSENCE

The right of a criminal defendant to be present at her trial is preserved by both the Sixth Amendment and the common law. Illinois v. Allen, 397 U.S. 337, 338 (1970). The right to be present is also implicated by the fair trial concerns of the Due Process clauses of the Fifth and Fourteenth Amendments. Kentucky v. Stincer, 482 U.S. 730, 745 (1987). This right is codified in Fed. R. Crim. P. 43(a).

However, the right to be present is not absolute and can be waived by the defendant. United States v. Diaz, 223 U.S. 442, 445 (1912). Federal Rule of Criminal Procedure 43(b) provides that a district court may proceed with trial when a defendant who is initially present "voluntarily absents himself after the trial has commenced." The Second Circuit has explained the policy behind the

17

"voluntary absence" rule as follows:

> The deliberate absence of a defendant who knows that he stands accused in a criminal case and that the trial will begin on a day certain indicates nothing less than an intention to obstruct the orderly processes of justice. No defendant has a unilateral right to set the time or circumstances under which cases will be tried. . . .
>
> Without this obligation on the accused the disposition of criminal cases would be subject to the whims of defendants who could frustrate the speedy satisfaction of justice by absenting themselves from their trials.

United States v. Tortora, 464 F.2d 1202, 1208 (2d Cir.), cert. denied, 409 U.S. 1063 (1972).

This court has held that in deciding whether to proceed with trial despite the defendants' absence the district court must determine (1) whether the defendant's absence is knowing and voluntary, and (2) if so, whether the public interest in the need to proceed clearly outweighs that of the voluntarily absent defendant in attending the trial. United States v. Benavides, 596 F.2d 137, 139 (5th Cir. 1979). We review the district court's finding that the defendant's absence is voluntary for clear error. Polizzi v. United States, 926 F.2d 1311, 1319 (2d Cir. 1991); Fed. R. Crim. P. 52. The decision to proceed without a voluntarily absent defendant is reviewed for an abuse of discretion. See United States v. Hernandez, 842 F.2d 82, 85 (5th Cir. 1988).

McBride primarily challenges the district court's finding that her absence was voluntary. This court has noted that "the right of a criminally accused to be present at [her] trial cannot cursorily, and without inquiry, be deemed by the trial court to have been waived simply because the accused is not present when [she] should have been." United States v. Beltran-Nunez, 716 F.2d

18

287, 291 (5th Cir. 1983). The trial judge must inquire into the reason for the defendant's absence and determine whether it constitutes a voluntary waiver of the right to be present. Id. Although not expressly decided by this court, other courts have held that voluntariness can be implied from the actions of the defendant. See United States v. Watkins, 983 F.2d 1413, 1419-20 (7th Cir. 1993). Courts have also held that when an accused does not appear at a time when she knows she should, the absence will be found voluntary under Rule 43 "in the absence of some compelling excuse." Tortora, 464 F.2d at 1210; see also United States v. Wright, 932 F.2d 868, 879 (10th Cir. 1991) ("Absence without compelling justification constitutes a waiver of the right to be present at trial."); United States v. Rogers, 853 F.2d 249, 252 (4th Cir.) ("[Defendant's] voluntary absence without compelling justification . . . constitutes a waiver of the right to be present."), cert. denied, 488 U.S. 946 (1988); cf. Cureton v. United States, 396 F.2d 671, 676 (D.C. Cir. 1968) ("[Defendant] must have no sound reason for remaining away.").

With these legal principles as a backdrop, we turn now to an analysis of the evidence. The records from the federal medical facility in Lexington, Kentucky, together with the Greenville hospital records (which the defense did not enter into the record until after the motion for new trial hearing), show that at most McBride suffered from depression and certain physical manifestations of depression--such as headaches and drowsiness. According to the Greenville Hospital records, when McBride checked herself into the hospital, she was drowsy but conscious. Although

19

she complained of headaches, sore throat, and shortness of breath, she showed no indicia of a serious drug overdose. McBride's stomach was pumped, and tests were conducted on the contents. The tests revealed no signs of narcotics, although there was some indication that she had vomited earlier. The mental health report prepared at Delta Regional Medical Center, dated September 20, 1993, indicated that McBride took the pills because of her concern over the trial. According to the report, McBride showed no more suicidal tendencies and indicated that she would return to court. The exhaustive report prepared by the federal medical facility in Lexington, dated November 9, 1993, found that McBride suffered from a form of depression, but that she denied any further suicidal inclinations. The report notes that her "typical functioning appears to be adequate" and that her physical health was fine, aside from hypertension and moderate obesity.

We conclude therefore that the district court did not err in finding that McBride voluntarily absented herself from the trial. Despite several opportunities to do so, McBride presented no evidence that she was physically or mentally incapable of attending the trial. The record evidence reveals that McBride was depressed and did not wish to face trial and the prospect of a conviction. A defendant cannot disrupt a trial for these reasons. McBride's refusal to attend the trial was knowing and voluntary and constitutes a waiver of her right to be present.

McBride contends that this conclusion directly contradicts the First Circuit's decision in United States v. Latham, 874 F.2d 852 (1st Cir. 1989). In Latham, the defendant had ingested a large

amount of cocaine in an apparent suicide attempt. After only an hour and a half delay, the trial court, who was initially told that Latham had bought a plane ticket and had absconded, ruled that the absence was voluntary and ordered that the trial proceed in Latham's absence. Although new evidence subsequently showed that Latham's absence was due to a cocaine overdose, the trial court denied all requests for an evidentiary hearing as well as Latham's post-trial motions.

The First Circuit reversed Latham's conviction, holding that voluntary ingestion of a large amount of cocaine in an apparent suicide attempt is not ipso facto a voluntary absence.[5] Id. at 858. However, the facts in Latham are readily distinguishable from the instant case. Latham ingested a lethal amount of cocaine and was given only a 25% chance of survival. As the trial proceeded, he was in critical condition in the hospital. In contrast, if McBride injected drugs at all, no evidence suggested that her life was threatened, or even that she was seriously ill. Thus even if we accept Latham's premise that a suicide attempt is not a "voluntary" act, McBride's failure to appear after the court delayed the trial a day and a half was a knowing and voluntary waiver of her right to be present.

As to the second prong of the Benavides test, we conclude that the district court did not abuse its discretion in proceeding in McBride's voluntary absence. The burden of having to indefinitely postpone or possibly retry this multi-defendant trial with numerous

_____

[5]    Although there was evidence suggesting that Latham had been forced to ingest the cocaine, the court analyzed the facts as if the ingestion was voluntary.

21

out-of-state witnesses and a district-wide jury clearly outweighed McBride's non-existent or feeble excuse for declining to attend the trial.[6]

## B.  MCBRIDE'S COMPETENCY

McBride argues next that the district court erred by failing to hold a competency hearing after her alleged suicide attempt. She contends that the court could not have found her voluntarily absent without first determining her competence.  Because McBride's attorney never filed a motion requesting a competency hearing,[7] we must determine whether the district court abused its discretion in failing sua sponte to order one.

18 U.S.C. § 4241 provides that the court

> shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

---

[6]  On appeal, Davis argues that the court erred in not granting him a severance after McBride failed to return for trial.  But Davis did not move for a severance nor bring any supposed prejudice to the district court's attention when McBride failed to appear for the second week of trial.  Also, the trial court gave a cautionary instruction after consulting with counsel for all parties advising the jury that no inference from McBride's absence should be made and no adverse conclusions affecting the remaining defendant should be drawn.  This argument is meritless.

[7]  McBride argues that her counsel's statement to the court that he thought it would be a good idea to wait for the results of her mental evaluation by the Greenville hospital before making the Rule 43 finding constitutes such a request. This vague reference to McBride's mental health is not sufficient to place competency at issue.  See Davis v. Alabama, 545 F.2d 460, 464 (5th Cir.) (holding that defendant's pre-trial motion for mental examination pursuant to Ala. Code tit. 15 § 425 was not sufficient to put competency at issue), cert. denied, 431 U.S. 957 (1977).

22

18 U.S.C. § 4241; see also Flugence v. Butler, 848 F.2d 77, 79 (5th Cir. 1988). Whether "reasonable cause" exists to put the court on notice that the defendant might be mentally incompetent is left to the sound discretion of the district court. United States v. Williams, 468 F.2d 819, 820 (5th Cir. 1972). In determining whether there is a "bona fide doubt" as to the defendant's competence, the court considers three factors: (1) any history of irrational behavior, (2) the defendant's demeanor at trial, and (3) any prior medical opinion on competency. Davis, 545 F.2d at 464 (citing Missouri v. Drope, 420 U.S. 162 (1975)).

McBride argues that the ingestion of fifty antidepressants in an apparent suicide attempt was sufficient to constitute reasonable cause to hold a competency hearing. In Drope, the defendant shot himself in the stomach prior to the second day of trial. The district court failed sua sponte to order a competency hearing before finding the defendant voluntarily absent. The Supreme Court reversed, holding that the failure to hold a competency hearing denied the defendant's right to a fair trial. 420 U.S. at 180.

However, in Drope, the Supreme Court expressly refused to decide whether an attempted suicide itself creates "reasonable cause" for a competency hearing. Rather, it held that the suicide attempt together with the information about defendant's mental instability prior to trial and the defendant's wife's testimony regarding his instability "created a sufficient doubt of his competence to stand trial to require further inquiry on the question." Id.

In this case, the evidence of incompetence was not

23

"sufficiently manifest" that the district court abused its discretion in failing on its own motion to order a competency hearing. See Zapata v. Estelle, 588 F.2d 1017, 1021 (5th Cir. 1979). There was no hint of incompetence before McBride's absence. After her absence, the district court stayed in close contact with McBride's physician, and the record reflects no information (except McBride's possible suicide attempt) that reflected adversely on her competency. The mental evaluation conducted at the hospital in Greenville does not indicate any severe mental problems or remaining suicidal thoughts.[8] Nor does the report from the federal medical facility in Lexington contain any information suggesting incompetency. The detailed report merely indicates that McBride was depressed but alert and that she had similar episodes in the past when confronted with stress. Thus, we conclude that the district court did not abuse its discretion in failing on its own motion to order a competency hearing.

## VII. OTHER POINTS OF ERROR

### A.

Appellant Jefferson makes three objections to the court's charge, none of which has merit. He objects first to the court's boiler plate instruction on note-taking by the jurors. Jefferson did not object to the instruction and the court's charge is certainly not plain error.

He argues next that his proposed charge on the CCE count, D-J-

---

[8] McBride argues that Dr. Estess' decision to subject her to a mental evaluation indicated his concern about her competence. However, the record indicates that such evaluations were performed for every patient admitted after a suicide attempt.

24

"was a perfectly legitimate instruction that should have been granted." Jefferson does not argue that the court's instruction failed to correctly state the elements of the crime and the definitions of the terms used in the statute. Because Jefferson has not demonstrated that the court's charge is erroneous, his contention that he was entitled to the particular language in his proffered charge is meritless.

Finally, Jefferson argues that the court should have granted his charge D-J-22 regarding limitations on the jurors' use of transcripts of taped conversations admitted into evidence. Again, he points to no error in the instruction given by the court. The court's instruction correctly stated the law, and Jefferson's argument that the court should have given his proffered instruction is meritless.

### B.

Appellant Williams complains that his right to a fair trial was violated by various incidents in which the trial court questioned witnesses in the presence of the jury. He also points to comments made by the trial court in the course of ruling on objections.

"A federal district judge may comment on the evidence, question witnesses, bring out facts not yet adduced, and maintain the pace of the trial by interrupting or setting time limits on counsel." United States v. Wallace, 32 F.3d 921, 928 (5th Cir. 1994). We have carefully reviewed the portions of the record Williams complains of and conclude that none of the comments or questions to which Williams refers was improper or went beyond the

25

proper role of the trial judge.

                                C.

    Williams argues next that his life sentence without parole for his conviction of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine amounted to cruel and unusual punishment in violation of the Eighth Amendment.  In addition to the amount of crack cocaine proved at trial, the district court accepted the presentence report finding that the conspiracy involved seventy-five kilograms of cocaine base.  Williams' constitutional attack is clearly without merit.  The Supreme Court recently upheld a life sentence without parole for possession of 650 grams of cocaine by a defendant with no prior convictions.  See Harmelin v. Michigan, 501 U.S. 957 (1991).

                                D.

    Appellant Davis challenges the district court's order disqualifying Davis' original attorney, Johnny Walls.  Following the government's disqualification motion, the court held a hearing and learned that attorney Walls had earlier represented Jefferson as a co-defendant in this case, as well as defendant Randy Williams in a related prosecution involving Williams' alleged purchase of narcotics from The Side Effect, Jefferson's night club.  Randy Williams entered a guilty plea and was expected to testify against Davis and his fellow defendants.  Thus, attorney Walls faced the prospect of cross-examining his client Williams, who had a 5K1 motion pending before the court.  It is also possible that he would have been required to cross-examine his previous client, Jefferson.  Following an evidentiary hearing, the court disqualified Walls and

made detailed findings in support of its ruling. Our review of the record reveals that the district court's findings are fully supported by the record, and we find no error in this ruling.

E.

Appellant Davenport argues that the district court erred in determining that he was responsible for twenty-five kilograms of cocaine. The evidence revealed that Davenport was a participant in the conspiracy from 1989 or 1990 until the organization was dismantled in 1992. Jefferson gave Davenport a number of responsible jobs in the conspiracy. Davenport was a street dealer. From time to time, he distributed crack cocaine packages to the street dealers and collected money from them. He occasionally handled the entire business in Jefferson's absence. He also was authorized to draw on The Side Effect bank account. Given this evidence, the district court made specific findings that Davenport knew or should have reasonably foreseen that the conspiracy distributed at least twenty-five kilograms of crack cocaine after he joined it. Davenport offered no evidence to refute this finding. The district court did not err in determining the amount of cocaine attributable to Davenport.

VIII. CONCLUSION

For the reasons stated above, we affirm the judgment of the district court.

AFFIRMED.

27