# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

April 15, 2009

Charles R. Fulbruge III
Clerk

No. 07-10433

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

LESTER JON RUSTON

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Lester Jon Ruston was charged with threatening to assault and murder a federal magistrate judge with intent to intimidate and retaliate against the judge in violation of 18 U.S.C. § 115 and was found not guilty by reason of insanity. The district court committed Ruston to the custody of the Attorney General under 18 U.S.C. § 4243(a). Prior to a § 4243(c) hearing to determine whether Ruston could establish that his release would not create a substantial risk of bodily injury to another due to a present mental disease or illness, Ruston's counsel filed a request for the court to hold a hearing to determine if Ruston was competent to waive his right to counsel. After holding a hearing, a

magistrate judge found Ruston competent to waive counsel. The district court then conducted a two-day § 4243(c) hearing where Ruston proceeded *pro se*. The district court found that Ruston failed to prove that he did not pose a substantial risk of bodily injury to others, and ordered that he remain in the custody of the Attorney General until he could be safely released to the community. Ruston appeals the district court's failure to *sua sponte* hold a competency hearing after observing Ruston's behavior at the § 4243(c) hearing and the court's determination that Ruston was competent to waive his right to counsel. For reasons discussed below, we REVERSE and REMAND.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 21, 2004, Ruston called the chambers of the Honorable Irma Ramirez, United States Magistrate Judge for the Northern District of Texas. Ruston left a threatening and profanity-ridden message on Judge Ramirez's answering machine. Ruston was arrested the following day and charged with threatening a federal official in violation of 18 U.S.C. § 115. Ruston then began filing erratic *pro se* motions in the district court.

On August 20, 2004, the Federal Public Defenders office was appointed to represent Ruston. Subsequently, the district court granted an unopposed Motion for Psychiatric and Psychological Consultation. Ruston, however, continued to engage in erratic *pro se* filings that contained allegations similar to the following: "[n]othing alleged in [the] indictment has anything to do with Irma Ramirez's capacity as a Federal Official. It has to do with a murder for hire plot, which the Northern District Court is attempting to cover up."

On May 4, 2005, the court held a competency hearing where a forensic psychologist with the U.S. Bureau of Prisons testified that Ruston suffered from a mental disorder, specifically delusional disorder prosecutorial type, that impaired his ability to assist counsel. The district court found Ruston suffering from a mental disease or defect rendering him mentally incompetent to assist

properly in his defense. Ruston was remanded to the custody of the Attorney General for purposes of attempting to restore Ruston to competency. Despite being represented by court-appointed counsel, Ruston continued to file nonsensical *pro se* motions with the court.

On September 13, 2006, Ruston's attorney submitted a motion entitled "Memorandum of Competency and Opposition to Involuntary Medication." On September 19, 2006, the district court held a competency hearing and found Ruston competent to stand trial. Dr. James Wolfson testified at the hearing and stated that Ruston had "present capacity to proceed to adjudication," but that "delusional material continue[d] to be present in Ruston's thinking and could impair his future capacity for entirely independent strategic legal decision making." Dr. Wolfson urged the district court to "prosecute [the] case quickly because [he] could give no assurance that [Ruston's] level of remission or at least rational strategizing might continue." On September 25, 2006, Ruston's attorney provided a Notice of Insanity Defense. On October 2, 2006, a Joint Stipulation of Fact was submitted where all parties agreed that Ruston was not guilty by reason of insanity. On October 12, 2006, the district court found Ruston not guilty by reason of insanity and ordered Ruston committed to the custody of the Attorney General. However, at the hearing his attorney stated:

> Mr. Ruston . . . seems to many times be competent and rationally interact with me, but there are other times where he seems to act irrationally. So I realize we are on - I'm trying to find the right words. Sort of the knife's edge of competency I guess on a day-to-day basis which makes things very difficult. So at this point in time this morning I feel he is interacting with me on a rational basis and making rational decisions, and I must say that he is rational. But since the [c]ourt found him competent and today[,] I think there are moments that he has become so irrational that he cannot be considered competent.

On February 13, 2007, Ruston's attorney filed a motion requesting that the Court hold a hearing to determine if Ruston waived his right to counsel, because Ruston wished to proceed *pro se* in a scheduled § 4243(c) hearing. On March 7, 2007, a magistrate judge held a hearing to determine whether Ruston was competent to waive counsel. The magistrate judge concluded that Ruston had "the ability to understand the nature and object of the proceedings to determine if he is a danger to society and underst[ood] the significance and consequences of his decision to waive counsel." Ruston, however, made the following telling statement at the hearing:

> I've been competent since the day I was arrested. I have a stack of medical records that have been suppressed this entire case that show no mental illness and complete competence. Every document filed by the government in this case has been a fraud. I've been denied a suppression hearing, I've been denied all my constitutional rights for almost three years and I'm tired of it.

The court granted Ruston's motion to proceed *pro se*, stating that the court would not force counsel on Ruston. Ruston, *pro se*, then filed additional nonsensical motions with the court.

On March 27-28, 2007, Ruston represented himself *pro se* in an 18 U.S.C. § 4243(c) hearing. A § 4243(c) hearing is held to determine whether the individual is a danger to himself or others. Ruston had the burden of proving by clear and convincing evidence that his release would not pose a substantial risk of bodily injury to others or damage to property. At the hearing, Ruston's demeanor demonstrated a lack of understanding regarding the nature of the proceedings against him.

*Dr. Wolfson's Testimony*

Dr. Wolfson testified that Ruston was unwilling to accept a diagnosis of mental illness and refused treatment. Dr. Wolfson also testified to reviewing a report of a forensic evaluation completed by Dr. Maureen Burris, and stated that

he disagreed with Dr. Burris's diagnosis that Ruston suffered from delusional disorder and instead diagnosed Ruston with paranoid schizophrenia. Dr. Wolfson also testified that it was possible that Ruston was bipolar or suffered from a personality disorder. Dr. Wolfson explained that regardless of whether Ruston suffered from paranoid schizophrenia or delusional disorder, both could be treated with medication, which Ruston was currently refusing.

The Government then asked Dr. Wolfson to testify regarding his review of letters and filings Ruston made over the few weeks and months preceding the § 4243(c) hearing. Dr. Wolfson testified that the recent filings were "getting a little stranger than what Ruston had been filing before" and that they were consistent with a diagnosis of Ruston suffering from paranoid schizophrenia. For example, the material included a filing where Ruston alleged that Katie Couric tampered with Dr. Wolfson. Dr. Wolfson stated that while previous filings were irrational, one could follow Ruston's reasoning. Dr. Wolfson found the more recent filings to appear "to be an expansion of [Ruston's] delusional system." Finally, Dr. Wolfson testified that he believed that without treatment Ruston posed a risk of dangers to others, and that Dr. Wolfson was less concerned about the risk to others' property.

During the course of Dr. Wolfson's testimony, Ruston objected repeatedly to properly given testimony on the grounds that (1) Dr. Wolfson was not a qualified expert under Federal Rule of Civil Procedure ("Rule") 702 (at least eight objections), (2) a previously filed motion to suppress should have be granted (at least six objections), (3) District Court Judge Fish should be disqualified (at least six objections), (4) he was denied his rights to confront witnesses, (5) the United States Attorney suppressed evidence from expert witnesses who would testify that Ruston did not suffer from mental illness, and (6) he had the right to speak his mind under the First Amendment.

Ruston then began his cross-examination of Dr. Wolfson. Ruston's questioning did not relate to whether he would pose a substantial risk of harm to others or property. Instead, Ruston asked Dr. Wolfson if:

- Dr. Wolfson's testimony was tampered with by the Washington, D.C. Capital Police;

- complaints Ruston filed with the Attorney General in Washington, D.C. were sent to Dr. Wolfson;

- Dr. Wolfson failed to respond in writing to "cop-outs" Ruston sent to Dr. Wolfson;

- Dr. Wolfson was aware of an alleged case between Ruston and Plano Independent School District;

- Dr. Wilson was familiar with an individual, undergoing care at the facility Dr. Wolfson worked, who murdered another patient;

- Dr. Wolfson was aware if the duties of a United States Magistrate Judge include conspiracy to commit murder;

- Dr. Wolfson was aware that Ruston accused Judge Ramirez of being involved in an attempt to murder him, and accused her of that in the message he left;

- Dr. Wolfson reviewed handwritten notes sent to the Federal Bureau of Investigation ("FBI") as part of an investigation about an attempted murder plot against Ruston, as well as handwritten notes of a United States Marshal and member of the United States Secret Service;

- Dr. Wolfson had contact with a Secret Service agent;

- Dr. Wolfson reviewed records connected to an individual allegedly discharged from the Central Intelligence Agency ("CIA") for embezzlement, explaining that:

> Jeffrey Don Elmore was discharged from the Central Intelligence Agency for embezzlement, and I have the right to United States 4247(d), and I have been denied that right. I

6

have the right to confront James Ellis, who conspired to arrest me. I believe under the Sixth Amendment I have the right to confront him, and I have subpoenaed him, and he's not in the courtroom as far as I can see;

• Dr. Wolfson was testifying that the Government suppressed medical records from Dr. Wolfson (Dr. Wolfson explained that he was not stating that);

• Dr. Wolfson reviewed a FBI report that referenced a black, former marine, hit man who was hired to murder Ruston, and any 911 records from the Carrollton Police Department on or about May 18, 2004, responding to a stalking and murder threat by the alleged hit man; and

• Dr. Wolfson "investigated Mr. Ruston's family lineage or looked at any of his family charts to determine whether he is descended from" Scottish royalty.

None of these questions involved the potential risk of danger Ruston posed to individuals or property if released. Ruston did ask at least two questions that were relevant. First, Ruston asked Dr. Wolfson if he was aware of an improper 2001 hospitalization that resulted in Ruston's release after a doctor in Plano diagnosed Ruston with no mental illness and without providing treatment or medication. Second, Ruston questioned Dr. Wolfson about his testimony at the earlier competency hearing, and asked how Ruston could have been miraculously restored to competence without medication or treatment. Dr. Wolfson stated

> that those spontaneous remissions are rare, but they occur, based upon my fairly lengthy interview at Seagoville the day before [the competency hearing you] appeared more rational. And you were not free of persecutorial delusions, but you were able to strategize and rationalize about your case . . . and you appeared to be able to do that. . . . [A]s I explained at length during that prior hearing, and I voiced a concern that since I hadn't done anything to make it happen – that it hadn't happened through treatment but spontaneously – the Court would be advised to prosecute your case

quickly because I could give them no assurance that level of remission or at least of rational strategizing might continue.

During the course of the cross-examination, Dr. Wolfson also testified regarding letters Ruston sent to Katie Couric, but stated that he was more concerned with letters written "under a Secret Service letterhead or some law enforcement agency, a fictitious letterhead." In response, Ruston asked whether Dr. Wolfson had ever been in contact with Katie Couric or NBC Television Networks. Dr. Wolfson answered in the negative. Ruston also asked whether Ruston ever claimed to know Katie Couric. Dr. Wolfson testified that Ruston never told Dr. Wolfson that Ruston knew her, and that Ruston indicated that his writings to Katie Couric were "comedy." Ruston then asked Dr. Wolfson if he was aware that Ruston was a comedy writer and appeared on local stations as a comedy character and professional actor, specifically on CBS television. Dr. Wolfson testified that he had heard Ruston state this before, but had no independent verification of Ruston's claims. Ruston concluded his questioning of Dr. Wolfson.

*Testimony of Dr. Lisa Clayton*

Ruston then called Dr. Clayton to testify. Dr. Clayton evaluated Ruston for competency to stand trial and met with Ruston on August 14, 2004, and September 23, 2004, as required in a court order issued by Judge Mary Miller. Ruston's examination of Dr. Clayton was also unrelated to the issue of whether Ruston's release would pose a substantial risk of harm to others and property.

As he did with Dr. Wolfson, Ruston consistently asked questions in an effort to demonstrate that law enforcement organizations and others were involved in an attempt to murder Ruston. Specifically, Ruston

· filed a motion to recuse Judge Miller;

8

- asserted that he was barred from attending the October 2004 competency hearing despite the fact that he never gets agitated and had no problem maintaining court decorum;

- questioned why Dr. Clayton's notes from her evaluations of him had been "suppressed";

- continued to make references regarding Katie Couric, and asserted that Dr. Clayton was lying when she testified that during the August 2004 evaluation Ruston told her that Katie Couric came to Dallas to meet Ruston and that Couric rented an apartment to be in the Dallas area to meet Ruston;

- asserted, contrary to Dr. Clayton's testimony, that he told her that a white female who appeared to be Katie Couric lured Ruston to meet him in person in July 2002 at an apartment;

- asked Dr. Clayton if she had been in contact with the United States Attorney's office in Plano, Texas;

- asked Dr. Clayton if he told her that he was assaulted and attacked by a black, male ex-marine and she testified that he did not;

- asked Dr. Clayton if she was aware that a judge conspired to have three inmates attack Ruston; and

- stated that Dr. Clayton was tampered with and ordered to perjure herself at the § 4243(c) hearing.

Ruston also asked whether Dr. Clayton testified at the October 2004 competency hearing that Ruston was filthy, dirty, and the most insane human being Dr. Clayton ever evaluated. Dr. Clayton stated that she did not know if she said that, but that when she saw Ruston he was very disheveled, agitated, started beating on a glass wall, and was "very psychotic" in her opinion. Ruston then asked if Dr. Clayton had evidence of his alleged beating on the glass wall.

When Dr. Clayton testified that others did not witness Ruston's behavior, he announced that he "didn't beat on any wall."

The Government then cross-examined Dr. Clayton. The Government asked Dr. Clayton to state her qualifications for the record, and Ruston objected stating "[s]tand on our motion to suppress, our Daubert better motion, 702 and our motion to disqualify Judge Fish." The court overruled the objection. Dr. Clayton testified that Ruston suffered from a severe mental illness. Ruston objected, stating "[w]e will stand on our motion to suppress, our Daubert motion under 702 and our motion to disqualify A. Joe Fish." The court again overruled the objection. Dr. Clayton continued testifying, and stated that Ruston suffered from a combination of schizophrenia and bipolar which is called schizo-effective disorder. The Government asked whether Ruston sounded agitated when he left Judge Ramirez the threatening voice mail, and she stated that he did. This concluded the Government's cross-examination.

Ruston conducted redirect. Ruston asked Dr. Clayton if she considered it mental illness to be agitated when someone attempts to murder you. She stated that she did not. Ruston then asked whether Dr. Clayton considered "it mentally ill to be agitated when you are kidnaped on fraudulent paperwork and denied all of your Constitutional rights." Dr. Clayton stated that she did not. This concluded Ruston's redirect.

*Testimony of Dr. George Trapp*

Ruston then called Dr. Trapp, a physician and psychiatrist. Dr. Trapp testified that he conducted a series of interviews of Ruston in August 2006 and prepared a forensic report for the court. Trapp testified that Ruston never appeared agitated during the examination, that Ruston never referred to Katie Couric as his fiancee, and that Dr. Trapp confirmed that Ruston was cast in an episode of Walker Texas Ranger to drive Senator Kay Bailey Hutchinson who made a guest appearance. Ruston then asked whether Dr. Trapp thought

10

Walker Texas Ranger would cast a "crazy maniac to drive Senator Hutchinson on a national program." Dr. Trapp stated that he did not know.

Dr. Trapp further testified that after his interviews with Ruston he concluded that Ruston was competent to stand trial. Dr. Trapp testified that he believed Ruston suffered from a diagnosable mental illness, but that it was in remission at the time sufficient to provide for competence for trial.

Ruston then asked whether he told Dr. Trapp that Ruston requested political asylum in Scotland and expressed a desire to leave the country. Dr. Trapp stated that Ruston had in fact told him this. Ruston then stated "[s]o is it your testimony that the defendant would not prevent any danger to this society since he has no intention of living in this society." Dr. Trapp agreed that if Ruston was living outside of the United States, he would not be a danger to those living in the United States. This concluded Dr. Trapp's testimony.

*Remainder of § 4243(c) Hearing Proceedings*

The court then inquired as to other witnesses Ruston wanted to present. Ruston stated that he subpoenaed Katie Couric, who was not in the courtroom, in an effort to question her about a July 2006 incident which "they continue to call a delusion." The court informed Ruston that only three subpoenas had been authorized, and continued the hearing until the next morning.

When court resumed the next morning, March 28, 2007, Ruston informed the court that he had additional evidence to present, but that he did not have an additional witness. Ruston then asked the court to take judicial notice of Ruston's application for asylum in Scotland and his intention to leave America.

The Government stated that it had no additional evidence, and argued that Ruston failed to prove by clear and convincing evidence that his release would not create a substantial risk to others. Ruston objected to all the "testimony just presented," stating that he stood on his motion to disqualify, motion to suppress, and Rule 702 motion. Ruston also stated that he had

11

additional evidence that the United States Attorney suppressed, and that the evidence consisted of doctors' reports that demonstrated that Ruston suffered from no mental illness and that it was all fabricated by a FBI agent. The court overruled the objection. Ruston then submitted what he referred to as "medical records" to the court. The court accepted the documents and described each document. The court then asked Ruston if he had any argument he wished to present, and Ruston stated that he wanted to call himself as a witness.

Ruston testified to a January 2001 arrest that took place in a bank lobby. Ruston stated that he did not have a hand-held crossbow at the time of his arrest, and that he did not attempt to shoot any Secret Service agents. He stated that the video from multiple security cameras would verify his testimony. Ruston then testified that he was denied all rights to present this evidence up to this point, and he wanted to state it for the record. Ruston continued to testify about other arrests, reports, and records he wanted to present, and again referenced a hit man who attempted to murder Ruston on three separate occasions and provided the court with the hit man's address. Ruston stated that he suspected the Carrollton Police and Plano Police of hiring the hit man. Ruston then testified that two judges committed judicial misconduct against him, and that he was a witness against one of those judges.

Ruston then testified that he never stated to Dr. Clayton that Katie Couric moved into an apartment to meet him. He testified that he was lured to the apartment where he viewed a female who appeared to be Katie Couric. Ruston stated that he felt uncomfortable with the situation and left the scene. Ruston explained that he was not aware if Katie Couric was the person at the apartment, but that he did not tell Dr. Clayton that he was engaged to Katie Couric or knew her because he had never met her. Ruston testified that he and Katie Couric communicated with each other through the mail. Ruston then testified to being the victim of an assault while in Dallas County Jail.

Ruston then alleged that he was kidnaped by a Secret Service Agent in conspiracy with two judges, taken to Parkland Hospital, and injected with medication without a warrant or court order. Ruston testified that they sent him to Terrell State Hospital, and that the agent told the hospital that Ruston was noncompliant with medication and out-patient treatment. Ruston continued testifying about records he requested and did not receive, and a tort suit he filed with the Deputy Director of the Secret Service. Ruston also testified that it was his belief that the FBI continued "to engage in witness tampering and obstruction of justice." Ruston went on to testify that he did not believe he suffered from a mental illness or needed medication.

Ruston maintained that he was not a danger or threat to anyone, but recognized that he had used bad judgment. Ruston stated that he was an alcoholic, and testified that he was "in remission." Ruston also stated that he said things in anger that he should not have said "because of the criminal act perpetrated against him."

Ruston then testified that he had no intention to continue living in the United States. Ruston explained that he applied for asylum in Canada and Scotland, and intended to leave the United States immediately upon release. Ruston stated that he would not be providing a forwarding address because he was "tired of the government stalking [him] and trying to murder [him]."

The Government cross-examined Ruston. Ruston testified that he left the threatening message for Judge Ramirez. The Government asked Ruston to verify that he signed a statement verifying that he said the words left on Judge Ramirez's answering machine. Ruston admitted that he signed it, but contended that he was blackmailed into signing the document as a result of the malpractice of his attorney. The Government then questioned Ruston about the various persons Ruston testified were conspiring to hurt Ruston. These persons included several judges and the "criminal element" of the FBI and Secret Service.

The Government asked Ruston if he believed the doctors who testified that he suffered from mental illness were a part of the conspiracy against Ruston. Ruston testified that he believed they were tampered with. Specifically, Ruston stated that one doctor was "a lesbian who was raped . . . and hates all males." The Government asked a few more questions and concluded its cross-examination.

The district court found that Ruston failed to prove by clear and convincing evidence that his release would not create a substantial risk of bodily injury to a person or property damage to another due to a present mental disease or defect. The district court ordered that Ruston continue to remain in the custody of the Attorney General until such time that he could be safely released to the community.

Ruston appeals from the failure of the district court to conduct a *sua sponte* competency hearing and appoint counsel based on Ruston's conduct during the § 4243(c) hearing.

## II. DISCUSSION

### A. Competency Hearing

We have not located controlling precedent as to what a district court must do when encountered with a defendant of questionable competency during a § 4243(c) hearing; however, "we find that jurisprudence developed . . . and related [to] competency questions in criminal trial proceedings [to be] instructive." *Mata v. Johnson*, 210 F.3d 324, 329 (5th Cir. 2000).

### 1. Standard of Review

Whether the district court erred in not *sua sponte* holding a competency hearing is reviewed for abuse of discretion. *See, e.g., United States v. Messervey*, 317 F.3d 457, 463 (5th Cir. 2002). "Whether 'a reasonable cause' exists to put the court on notice that the defendant might be mentally incompetent is left to the sound discretion of the district court." *United States v. Davis*, 61 F.3d 291,

304 (5th Cir. 1995) (citation omitted); *see also United States v. Alden*, 527 F.3d 653, 659 (7th Cir. 2008). "The district court is in the best position to determine the need for a competency hearing." *Alden*, 527 F.3d at 659 (citation omitted). But "[i]f the trial court received evidence, viewed objectively, that should have raised a reasonable doubt as to competency, yet failed to make further inquiry, the defendant has been denied a fair" proceeding. *Mata*, 210 F.3d at 329; *see also Alden*, 527 F.3d at 659 (explaining that a district court may *sua sponte* order a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.") (citation omitted); *United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008) (holding that the appropriate inquiry "is not whether the trial court could have found the defendant either competent or incompetent, nor whether the reviewing court would find the defendant incompetent" but instead "the record is reviewed to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence.") (quotations omitted).

### 2. Analysis

The statutory requirements for a district court to *sua sponte* hold a competency hearing are set out in 18 U.S.C. § 4241(a), entitled "[d]etermination of mental competency to stand trial or to undergo postrelease proceedings." Section 4241(a) states that

> [t]he court shall . . . order [ ] a [competency] hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

15

In determining whether the court should order a § 4241(a) hearing, the court must consider three factors: (1) the existence of a history of irrational behavior, (2) the defendant's demeanor at trial, and (3) prior medical opinion on competency. *See Messervey*, 317 F.3d at 463. All three factors are "relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007) (citing *Drope v. Missouri*, 20 U.S. 162, 172, 180 (1975)). The record reflects that Ruston meets the three factors as set out in *Messervey*.

Ruston has an extensive history of irrational behavior paired with multiple diagnoses documenting his mental illness. It is important to note that the psychiatrists who examined Ruston found that he suffered from either a delusional disorder or paranoid schizophrenia. After examining Ruston's history, it is apparent to the Court that he has an extensive history of irrational behavior as a direct result of delusions. Specifically, Ruston believes that various law enforcement agencies, members of the judiciary, and possibly Katie Couric are engaged in a plot to murder him.

The instant case arose out of a threat Ruston issued against Judge Ramirez. In the threatening message, Ruston specifically alleged that Judge Ramirez was engaged in an attempted murder plot against Ruston. After arrest, Ruston filed documents with the court asserting that he was indicted not because he threatened a federal official, but because the United States District Court for the Northern District of Texas was attempting to cover up a murder to hire plot that Judge Ramirez was involved in planning. The Government was unable to proceed against Ruston because the doctors who examined him found

him to be incompetent. When assessing competency, the court must "ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *Drope*, 420 U.S. at 172 (citing *Dusky v. United States*, 362 U.S. 402 (1960)). Specifically, Ruston was diagnosed with a delusional disorder of a prosecutorial type, which impaired Ruston's ability to properly assist counsel.

When Ruston was eventually found competent to stand trial, Dr. Wolfson made it clear to the district court that Ruston was far from cured. Dr. Wolfson testified that while Ruston was presently capable of proceeding to adjudication, he still suffered from delusions that could impair his ability to make legal decisions in the future. After Ruston and the Government agreed that Ruston was not guilty by reason of insanity, his own attorney explained to the district court that he did not believe Ruston maintained competency between the time Ruston was found competent and the date the district court entered judgment.

At the § 4243(c) hearing, Dr. Wolfson testified that he reviewed Ruston's filings with the district court from the time the district court entered judgment and the § 4243(c) hearing. Dr. Wolfson specifically testified that Ruston's ability to make cogent arguments deteriorated during this time. Further, Dr. Wolfson explained that the most recent filings appeared to demonstrate "an expansion of [Ruston's] delusional system." Dr. Wolfson's testimony at Ruston's competency hearing warned that Ruston's level of competency was likely to wane and based on Ruston's filings, Dr. Wolfson found that Ruston was suffering just that sort of deterioration. This testimony, in conjunction with Ruston's history of irrational behavior, might have provided a reasonable cause to believe that Ruston was presently suffering from a mental disease or defect.

This, however, was not the only evidence before the district court of Ruston's questionable competency. Ruston's demeanor and questioning during

the § 4243(c) hearing provided additional reason to believe that Ruston may have been suffering from a mental disease or defect.

During the magistrate judge's hearing to determine if Ruston was competent to waive counsel, Ruston was generally able to answer the magistrate judge's questions, although the language quoted above indicated that Ruston may have still been suffering from "delusional material." But Ruston's perceived level of competency at the magistrate judge's hearing does not abrogate the duty of a judge to "always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to" proceed with the § 4243(c) hearing. *See, e.g.*, *Drope*, 420 U.S. at 181.

At the § 4243(c) hearing, Ruston did not demonstrate a "rational as well as factual understanding of the proceedings against him." *See Drope*, 20 U.S. at 172 (citation omitted). Instead, Ruston's questioning, objections, and behavior at the hearing provided reasonable cause to believe that Ruston was presently suffering from a mental disease or defect, specifically a mental disease that exhibits itself through delusions, rendering Ruston mentally incompetent. *See, e.g., Alden*, 527 F.3d at 659. Ruston continued to assert that the government was engaged in a plot to kill him and that Katie Couric may have been involved in the plot. He actively insinuated that law enforcement agents tampered with witnesses. He also alleged that he was attacked by fellow inmates. During the § 4243(c) hearing, Ruston largely failed to ask relevant and pertinent questions regarding the substantive issue of the hearing–whether Ruston's release posed a significant risk of bodily injury to others. Ruston's delusions were readily apparent throughout the § 4243(c) hearing.

While Ruston was found competent at his most recent competency hearing, that competency hearing was conducted six months prior to the § 4243(c) hearing. Dr. Wolfson made it clear at the competency hearing that he did not believe Ruston's current competency to be permanent, urging the court to

proceed with prosecution immediately while Ruston could still be considered competent. Once the § 4243(c) hearing began, it is apparent from the record and transcripts that Ruston had again descended into irrational behavior.

We hold that the district court abused its discretion when it did not *sua sponte* hold a competency hearing upon observing the erratic behavior of Ruston at his § 4243(c) hearing. The district court was on notice of Ruston's troubled history and had a duty to ensure that Ruston was competent before allowing the § 4243(c) proceeding to continue.

## B. Waiver of Counsel

We decline to reach the issue of whether the district court erred in allowing Ruston to waive his right to counsel before proceeding with the § 4243(c) hearing in light of the Supreme Court's recent decision in *Indiana v. Edwards*, 128 S. Ct. 2379 (2008).

In *Edwards*, the Supreme Court held that the Constitution does not forbid states from insisting upon representation by counsel for those competent enough to stand trial but who suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves. *Id.* at 2387-88. We note that *Edwards* involves representation within the context of a criminal trial, and Ruston's appeal involves a commitment proceeding. Nonetheless, *Edwards* appears directly applicable to the issues presented in this case. *Edwards* contemplates a scenario where a criminal defendant is conclusively competent to stand trial, but may not be competent to conduct trial proceedings by his or herself. Because this Court has determined that a question remains as to whether Ruston was competent to proceed with the § 4243(c) hearing, it is inappropriate to move to the next step outlined in *Edwards* and make a determination as to whether Ruston was competent to represent himself at the § 4243(c) hearing.

19

## III. CONCLUSION

For the foregoing reasons, we REVERSE and REMAND to the district court for proceedings consistent with this opinion.